These are appeals from jury verdicts and judgments in actions — (1) on a claim for damages to a truck, based on the Alabama Extended Manufacturer's Liability Doctrine, and (2) on a claim for damages for loss of use of the truck during the repair time. We affirm both.
In September, 1977, Dunaway bought a truck manufactured by Ford Motor Company from Joe Sartain Ford for $22,257.09. On February 27, 1978, the truck's engine caught fire and burned while the truck was being driven by an employee of Dunaway. American Indemnity paid $18,299.38 to repair it. American, subsequently, brought its action as subrogee to collect the repair bill. Its claim was brought under the Alabama Extended Manufacturer's Liability Doctrine in one count, see Casrell v.Altec Industries, 335 So.2d 123 (Ala. 1976), and for breach of implied warranty in another count. Later, Dunaway joined American and claimed damages for loss of the truck's use. The trial resulted in separate jury verdicts — $19,446.61 for American — $12,320.00 for Dunaway.
 1.
American Indemnity Company's claim against Ford Motor Company and Joe Sartain Ford under the Extended Manufacturer's Liability Doctrine
First, Joe Sartain Ford does not argue any error in the judgment against it by American. Therefore, this part of the opinion relates to the contentions of Ford Motor Company.
Ford Motor Company contends that American and Dunaway should not recover damages against it because they failed to prove that the truck was either sold in a defective condition or that it reached the user without substantial change. It further contends that their proof was merely res ipsa loquitur — a doctrine inapplicable in an action based on AEMLD.
The evidence shows that when Dunaway ordered the truck from Joe Sartain Ford, they agreed on the specifications for the truck; that it was to be delivered to Mike Wiley Company in Nashville, Tennessee, for installation of a dump body. The truck was manufactured at Ford's Louisville, Kentucky, plant, and shipped by common carrier to Nashville. There, Wiley installed the dump body, and the truck began its trip to Joe Sartain. But, a not-so-funny thing happened on its way. While it was being driven by Sartain's employee from Nashville to Decatur, it "slung a rod," knocking a hole in the air compressor, and leaving it without brakes. It was towed to Sartain, and there the truck was repaired by Sartain with Ford Motor Company parts. The repairs were paid by Ford Motor Company. (Ironically, Dunaway was not told of these events before his purchase.)
Dunaway used the truck from the dates of its delivery until the latter part of December, when it became immobile because *Page 283 
of bad weather. But, during the period of its immobility, the truck was kept in Dunaway's shop without molestation.
On the morning of the fire — well, read what American says in brief about the events leading up to the conflagration:
 On the morning of the fire before Orme left Dunaway's shop with the truck, he checked the water and oil and the engine oil level was full. He had made two relatively short trips hauling gravel and when he was returning to a quarry to get another load and was driving along the highway at a speed of about 40 miles per hour when the fire occurred.
 The details of Orme's testimony were that just before the fire a woman in a car meeting him started blinking her lights and almost ran off the road. At this time the engine of the truck quit running and it lost power. Orme, thinking it was not getting gas, manipulated a switch to change the gas supply from one tank to another. At this time the cab of the truck filled with smoke which came from the engine compartment through the wall separating it from the cab. Orme pulled off the road and jumped out and saw the truck was on fire in the engine compartment and he ran from the truck. He called Dunaway and the Hartselle fire department which responded and extinguished the fire which had burned the truck extensively.
 After Dunaway arrived, he and Orme walked back along the highway behind the truck and observed a trail of droplets of oil on the pavement which led up to the truck and trailed behind it for a distance which Dunaway estimated as 600 to 700 feet and which Orme estimated as 200 feet. They then checked the oil level in the crankcase of the engine and found it to be two quarts low.
 The truck was taken to Joe Sartain Ford's place of business on the day of the fire but Sartain was not equipped to repair it and it was then taken to another place where it was repaired.
The real bone of contention between American and Ford Motor Company was the credibility of American's expert witness as opposed to Ford's. Ford maintains that American's witness had never studied automotive design, whereas its witness had been employed by Ford for twenty years. Their differences are: American's witness testified that the fire was caused by the failure of a neoprene hose; Ford's witness said that the hose was made of luna rubber, and that there had never been any question about the sufficiency of the design of this line of trucks.
The competency of a witness to testify as an expert is largely discretionary with the trial court. And, his decision will not be disturbed on appeal except for palpable abuse.Maslankowski v. Beam, 288 Ala. 254, 259 So.2d 804 (1972);Trans-Southern Life v. Johnson, 287 Ala. 620, 254 So.2d 321
(1971). We find no abuse of discretion. American's expert was an electrical engineer. His firm was engaged in the business of equipment failure analysis, including fire and explosion investigations.
In his testimony he concluded that the cause of the fire was a failure in the neoprene hose and that one of the reasons that led him to that conclusion was the melting of the carburetor which indicated to him that it was not gasoline that was burning on the top of the engine that caused the tremendous amount of heat (the amount of heat in a pound of gasoline is much less than the calorific contents in a pound of oil) that was necessary to melt the carburetor. In his opinion the hose failed and oil was sprayed and eventually deposited on top of the hot engine. The sprayed oil caught fire and the fire melted the carburetor away. He subsequently examined a Ford truck of the same model at a Ford dealership and found it to have the same neoprene hose. On cross-examination he pointed out, contrary to Ford's expert, that the oil line was not metal; otherwise, it would have left a residue line. Furthermore, he judged the neoprene line to be a bad design.
In the first case decided by this court under the Extended Manufacturer's Liability *Page 284 
Doctrine, this Court held that whether or not a product is defective is ordinarily a question for the jury. Casrell v.Altec Industries, 335 So.2d at page 133 (Ala. 1976). Casrell
defined defect as that which renders a product unreasonably dangerous, i.e. not fit for its intended purpose. The care with which the product was manufactured and sold is not material.
We conclude that there was sufficient evidence of a defect to submit the case to the jury under the Extended Manufacturer's Liability Doctrine.
 2. Dunaway's claim for Loss of Use of the truck
The evidence is in sharp conflict as to whether Dunaway abandoned the burned truck, and replaced it by getting a new truck. He did get a new truck after the one involved in this litigation was damaged by fire. But, Dunaway contends that he had ordered two trucks and the damaged truck was just one of the two. To the contrary, Ford Motor Company contends that the truck was a total loss; therefore damages were limited to the difference between value of the truck before the fire, and its value after the fire. Additionally, it contends that damages cannot be had for both total loss of the truck and the loss of use of it. Fuller v. Martin, 41 Ala. App. 160, 125 So.2d 4
(1960).
In Hunt v. Ward, 262 Ala. 379, 79 So.2d 20 (1955), this Court stated:
 The primary rule is generally stated to be that the damage is embraced in the formula that it is the difference in the value of the truck before and after the accident, caused by the accident. If it is so damaged as not to be repairable and had no value after the accident, it would be simply its value at the time of the accident (less its junk value, if any). On this amount interest should be allowed. If it is repairable and the owner sees fit to repair it and while doing so he is deprived of its use and incurs other expense in that connection, he may have the reasonable cost of the parts and labor in making the repairs together with the reasonable cost of transporting it and other incidental cost, if any, and the reasonable value of its use or hire during that time, on the theory that he could have hired one for use during that period: also interest on the total as indicated above.
The evidence showed that the value of the truck before the fire was $20,000.00-$22,000.00 — value after $3,000.-$4,000.00. Dunaway testified that the truck was a total loss and so did his driver. But, the evidence also shows that the truck was repaired for $18,299.38. Dunaway, subsequently, transferred it to another person on a lease-purchase agreement for a consideration of $16,000.00.
Next, Ford Motor Company, as well as Joe Sartain, argues in brief that even if damages are awarded for loss of use, they should be only for two or three weeks' loss because Dunaway testified that he was using a new truck for work within that period after the fire. This two- or three-week span appears to be an afterthought by Ford and Sartain. They did not raise this point in the motion for new trial. Moreover, there was no motion to remit the damages for excessiveness. We cannot review the trial judge for something not presented to him.
We conclude that the trial judge adequately charged the jury on the question of "total loss"; this was a jury question; it decided against Ford and Joe Sartain; the trial judge overruled their motion for new trial, thereby, strengthening the jury verdict, and it should not be set aside unless palpably wrong. We hold that the verdict should not be disturbed.
The judgment under the Extended Manufacturer's Liability Doctrine and the judgment for loss of use are affirmed.
AFFIRMED.
JONES, ALMON, EMBRY and ADAMS, JJ., concur. *Page 285