521 A.2d 1276

The POTOMAC EDISON COMPANY

v.

Edward M. BURDETTE, et al.

No. 921, Sept. Term, 1986.

Court of Special Appeals of Maryland.

March 10, 1987.

Douglas B. Schoettinger (Jeffrey B. Smith, Michael H. Davis and Smith, Somerville & Case, on the brief), Baltimore, for appellant.

Richmond T.P. Davis (Cynthia B. Malament, on the brief), Rockville, for appellees.

Argued before GILBERT, C.J., and WILNER and BISHOP, JJ.

GILBERT, Chief Judge.

This appeal is the result of a law suit by a dairy farmer against a public utility. It involves *res ipsa loquitur* and the effect of "stray voltage" on milk production of dairy cows.

Edward M. Burdette is a third generation dairy farmer. He and his stepmother, Juanita Burdette, have been operating a dairy farm at its present location in Montgomery County since 1964. The Potomac Edison Company (Potomac Edison) has provided electrical power to the Burdette farm since that time. To accomplish that end, Potomac Edison caused a transformer to be situated on a utility pole near the Burdettes' farm buildings. The transformer reduced electrical voltage on the main distribution line from more than 7000 volts to an amount usable for farm and household use, namely, 120 to 220 volts.

In the summer of 1979, Mr. Burdette felt "a little sting and tingle" when he touched a metal splash pan that was in the milking parlor of his barn. He turned off all the electrical equipment on the farm and again touched the metal apparatus. He "still got the same reaction ... that little tingle." Potomac Edison was contacted about the problem, and a customer service representative told Mr.

Burdette to "get an electrician to check [the] equipment."[1] Burdette called his electrician, who went to the farm but found no problems with the electrical equipment. Later in the same year, Mr. Burdette mentioned the problem to a Potomac Edison employee who was working on a power line near the farm. The lineman said the problem "had to be something on [Burdette's] service."

Mr. Burdette, in early 1980, began to see "dramatic changes in the behavior of the cows." They became reluctant to enter the milking parlor and were uncooperative in the milking operation, and milk production dropped. To reverse that trend, the Burdettes fed the cows high nutrient feed and changed the calving intervals as well as the milking schedules. Although a slight increase was noticed, milk production remained below normal.

While attending a Montgomery County Holstein Association meeting in March 1981, Mr. Burdette heard Dr. Robert Peters of the University of Maryland speak on the effect that "stray voltage"[2] had on dairy cows. Burdette related Dr. Peters's description of the stray voltage problem to his own particular situation, and he asked Dr. Peters for assistance. A demonstration test at the Burdette farm was performed that month by Dr. Robert Appleman of the University of Minnesota. He was accompanied by a representative from Potomac Edison. Dr. Appleman's prelimi-

---

1. Potomac Edison told the jury that it had no record of the conversation. Its policy at that time was not to keep records of that type of customer complaint.

2. As defined by Dr. Alfred P. Szews, an expert witness, "stray voltage" is "voltage which exists where you don't want it to exist, but it probably is an inherent part of the electrical system." Electrical energy produced in a power company's generator travels along transmission lines through the substation and primary distribution lines to the transformer at the customer's location. There voltage is reduced for the customer's use. The excess current travels towards the substation through neutral wires which are grounded at the transformer location and at regular intervals along the distribution circuit. Stray voltage travels into the earth through the grounding lines and returns to the distribution circuit.

nary finding was that "a stray voltage problem very probably existed," and the results indicated a "very strong suggestion" that Potomac Edison's equipment was the source. Dr. Appleman's findings were inconclusive, however, as to how the Burdettes' farm equipment may have contributed to the stray voltage problem.

At a meeting in March 1981, Calvin Stewart, Potomac Edison's representative, recommended that the Burdettes take steps to eliminate the problem, including repair of various faults in the farm wiring that were noticed during Dr. Appleman's testing. The Burdettes' electrician completed the repairs by June 1981, but the problem persisted. Mr. Burdette again contacted Dr. Peters who arranged for a test in December 1981 by Potomac Edison in order to determine the source of the stray voltage. It is disputed whether that test was completed.

After contacting both his electrician and Dr. Peters, Mr. Burdette had an isolating transformer installed on the farm in August 1982. Following the installation of the isolating transformer, which prevented stray voltage from entering the milking parlor, the behavior of the cows, generally, became more normal and milk production increased.

The Burdettes sued Potomac Edison in the Circuit Court for Montgomery County. The suit alleged that Potomac Edison was negligent in permitting "excessive or stray voltage to emanate from its company neutral" and in not correcting the "harmful condition." Additionally, the Burdettes averred that Potomac Edison willfully failed to advise the Burdettes concerning the nature and danger of the problem and to take appropriate measures to correct the situation.

A jury agreed with the Burdettes and returned a verdict against Potomac Edison in the amount of $420,000.

In this Court Potomac Edison posits five questions:
"1. Whether the trial court erred in instructing the jury on the doctrine of res ipsa loquitur and thereby

permitting the jury to find that any stray voltage problem was caused by negligence on the part of Potomac Edison.

2. Whether the trial court erred in denying Potomac Edison's motion for judgment upon the ground that there was legally insufficient evidence of negligence on the part of Potomac Edison proximately causing plaintiffs' alleged damages.

3. Whether the trial court erred in admitting evidence of a 1984 publication to be considered in connection with the issue of Potomac Edison's alleged negligence between mid–1979 and August 1982.

4. Whether the trial court erred in refusing to admit in evidence Potomac Edison's tariffs approved by the Public Service Commission and in effect during the times relevant to the suit.

5. Whether the trial court erred in admitting evidence of prejudgment interest accruing on plaintiffs' alleged lost profits, thus allowing the jury to award damages which included a substantial amount of prejudgment interest."

In light of our disposition, we shall answer only issues 1 and 2.

We summarize briefly the evidence presented.

Louis P. Scarborough, a Potomac Edison expert in electrical engineering and distribution systems as well as the requirements of facilities in the distribution system, testified:

a. while he was an electrical engineer at Potomac Edison, he learned of stray voltage problems on dairy facilities as early as 1969;

b. in 1979–80 Potomac Edison "started getting calls" inquiring about stray voltage on dairy farms in Maryland;

c. he investigated over 200 complaints having to do with the "general subject of stray voltage" and in 10 to 15 percent of those cases the problem was caused by "circumstances external to the customer, on company facilities or some related utility equipment";

d. Potomac Edison knew that dairy cows could be adversely affected if exposed to stray voltage over one half of one volt.

Potomac Edison further knew:

a. the Burdettes operated a dairy farm;

b. the Burdette farm was at the end of that particular distribution line.

Levels of stray voltage are usually higher near the end of the distribution line than at other points in the distribution circuit;[3]

Potomac Edison did not keep a record of the call from Mr. Burdette in 1979 in which he informed the power company of the mild shock he felt when his own electrical equipment was turned off, and Potomac Edison conducted no tests in response to the call.

Dr. Robert Appleman, Professor of Animal Science and Extension Dairy Specialist at the University of Minnesota, an expert witness called on behalf of the Burdettes, told the jury that in March 1981 he performed a test for stray voltage at the Burdette farm. His preliminary finding showed that "a stray voltage problem very probably existed," and there was a "very strong suggestion" that Potomac Edison's equipment contributed to the problem. Calvin Stewart, a Potomac Edison representative, was present during the test and was aware of Dr. Appleman's conclusions.

Luther Cromer, a Potomac Edison employee who had no prior training regarding stray voltage, was sent to the Burdette farm in December 1981 to test for stray voltage. It is disputed whether Mr. Cromer finished the test. In any event, the results were not furnished to the Burdettes, and prior to the time of the filing of the instant suit, Potomac

---

3. Dr. Alfred P. Szews explained that "at the end of the line, the return currents have only one direction to go. They can only go back along the neutral conductor or through the earth." *See West Penn Power Company v. Pennsylvania Public Utility Commission,* 84 Pa.Commw. 157, 159 n. 3, 478 A.2d 947, 948 (1984).

Edison undertook no further testing for stray voltage on the farm.

After the Burdettes had installed the isolating transformer and noticed improvement in both the behavior and milk production of the cows:

    a.  Ralph Lee, an expert in electrical engineering, performed a test for evidence of stray voltage at the Burdette farm in July 1985. He found "stray voltage ... [developed] from [Potomac Edison's] utility transformer and its grounding system. There was [, however,] no stray voltage on the system that had been installed by Mr. Burdette as the auxiliary or override over the utility system."

    b.  Dr. Alfred P. Szews, Associate Professor of Electrical Engineering and Computer Science at Marquette University, informed the jury that he performed a test at the Burdette Farm in August 1985 so as to determine the level of stray voltage. He found a "minimal amount" in the milking area, which was separated from Potomac Edison's equipment by the isolating transformer, and from 4.2 to 7.2 volts between Potomac Edison's equipment and reference points outside the milking area. Dr. Szews also said that the stray voltage "originat[ed] on the power company's primary distribution lines";

    c.  Dr. Szews further related that stray voltage from a utility distribution line at levels of 5 to 6 volts is an "unreasonably high" level for a dairy farm.

    d.  Ralph Lee further related that if stray voltage originating from Potomac Edison's power lines existed on the Burdette dairy farm at levels sufficient to cause injury to cows, Potomac Edison was not "in conformance with the principles of the National Electric Safety Code."

With regard to proximate cause and damages, Dr. Appleman opined that there was a "reasonable probability" that the cows were suffering from a stray voltage problem, which in turn caused a decrease in milk production. He based his opinion on the decline in milk production between

1980 and 1982, the year when the isolating transformer was installed. He stated that a level of stray voltage existed in the milking parlor that was sufficient to affect adversely the Burdettes' cows.

Dr. Richard Levins, an agricultural economist, informed the jury with regard to the profits the Burdettes lost because of the decrease in milk production. Norman Hill, an expert in the evaluation of dairy cattle, presented testimony concerning the Burdettes' loss of herd value.

■ We ask, rhetorically: Did the Burdettes produce any legally relevant and competent evidence from which rational minds could infer facts supporting the claim of negligence? We think they did, in spite of Potomac Edison's assertion that the Burdettes "relied instead upon illegitimate inferences and irrelevant innuendos." As we see it, the evidence recounted above was sufficient, if believed, to support a finding of negligence on the part of Potomac Edison.

■ Were that all we must consider, we would have no hesitancy in affirming the judgment of the circuit court. We are, however, confronted with the additional issue: Did the trial judge err in instructing the jury, over objection, as to *res ipsa loquitur?*

The record reveals that at the conclusion of the evidence, the court instructed:

"The fact that an accident happened does not mean that it was caused by negligence. However, if each of the following circumstances are more probable than not, you may conclude that there was negligence.

First, the event would not ordinarily happen without negligence; second, the cause of the event was within the defendant's exclusive control; third, no action by anyone else, including the plaintiff, was the cause of the event.

Should you find that it was more probable than not that the defendant was negligent, the defendant is then called upon for a satisfactory explanation and may explain to your satisfaction that there was no negligence on his part which was the cause of the event. If you are not satis-

fied with the defendant's explanation and conclude that the defendant's negligence caused the plaintiff's injuries, your verdict should be for the plaintiff." [4]

The difficulty with the *res ipsa* instruction is that it is simply inapplicable to the facts as adduced by the evidence.

It has long been held that, in order to be entitled to recover damages on the basis of *res ipsa loquitur,* the plaintiff must show by a preponderance of the evidence that: (1) the injury is of a nature not ordinarily occurring in the absence of negligence; (2) the defendant had exclusive control over the instrument that caused the injury; and (3) the injury did not result from any act or omission of the plaintiff. *Giant Food, Inc. v. Washington Coca-Cola Bottling Company, Inc.,* 273 Md. 592, 597, 332 A.2d 1, 4 (1975), *aff'g Sheeskin v. Giant Food, Inc.,* 20 Md.App. 611, 318 A.2d 874 (1974); *Munzert v. American Stores Company,* 232 Md. 97, 104, 192 A.2d 59, 63 (1963); *Pahanish v. Western Trails, Inc.,* 69 Md.App. 342, 517 A.2d 1122 (1986); *Chesapeake and Potomac Telephone Company of Maryland v. Hicks,* 25 Md.App. 503, 513–18, 337 A.2d 744, 751–53, *cert. denied,* 275 Md. 750 (1975); Gilbert, *Maryland Tort Law Handbook* § 14.1 (1986). Potomac Edison avers that the "first two elements of the tort are clearly not satisfied."

The injury in the matter *sub judice* is the effect of the stray voltage on the Burdettes' dairy cattle, i.e., the reduction in milk production and herd value between 1980 and 1982. The parties agree that some level of stray voltage must exist as an inherent part of the electrical distribution system.

Let us look again at what was shown by the evidence. In addition to that which we have enunciated above, the Burdettes proved that cattle are unusually sensitive to even small amounts of voltage. The plaintiff's experts testified

---

4. We observe that the instruction tracks that contained in *Maryland Pattern Jury Instructions—Civil* (Lawyers Cooperative 1977) 15.4.

that an electrical distribution system built to existing standards would still yield a voltage of 1 to 10 volts without any defect in the utility's equipment. There was other testimony that the effect of stray voltage on the dairy industry was not appreciated until the late 1970's or early 1980's.

That evidence established that even in the absence of negligence the dairy cows could have been affected by the stray voltage. Consequently, the evidence ran afoul of the first of *res ipsa*'s three elements, namely, "the injury is of a nature not ordinarily occurring in the absence of negligence." *Chesapeake and Potomac Telephone Company of Maryland v. Hicks*, 25 Md.App. at 516–18, 337 A.2d at 752–53, *supra*. Clearly, the evidence shows that the injury to the Burdettes may have occurred in the absence of anyone's negligence. Therefore, consideration by the jury of the applicability of *res ipsa loquitur* was eliminated, and it was error to grant the instruction.

■ If an instruction on the basis of *res ipsa loquitur* could be granted under the circumstances of this case, it could be granted in almost every negligence case. Once the plaintiff established evidence of negligence on the part of the defendant, he or she could then ask for a *res ipsa* instruction as a sort of insurance against the jury's not believing the direct evidence yet perhaps believing that the incident would not have occurred but for someone's negligence. *Chesapeake & Potomac Telephone Company of Maryland v. Hicks, supra*.

The justification for the instruction sought might simply be that the incident happened and it would not have happened in the absence of someone's negligence. Patently, *res ipsa loquitur* would degenerate into a secondary or "backup" instruction in virtually every negligence action.[5] That is precisely what happened in the instant case.

---

5. We do not express an opinion whether there would be reversible error when the evidence of the defendant's negligence is beyond question but the plaintiff, nevertheless, seeks and obtains *res ipsa*

From our review of the record, we are unable to ascertain the extent, if any, to which the jury relied upon the *res ipsa loquitur* instruction in reaching its verdict. Moreover, we cannot declare that the evidence of negligence on the part of Potomac Edison was so overwhelming that any instruction with respect to *res ipsa loquitur* would have been harmless. Because we cannot make that determination, we must reverse the judgment and remand the case for a new trial.

JUDGMENT REVERSED.

CASE REMANDED FOR A NEW TRIAL.

COSTS TO BE PAID BY APPELLEES.

*loquitur* instructions. *See,* however, W. Page Keeton, *Prosser and Keeton on Torts* Ch. 6 § 40 (5th ed. 1984).