549 A.2d 385

Gina HARRISON, et vir.

v.

**BILL CAIRNS PONTIAC OF MARLOW HEIGHTS, INC., et al.**

**No. 6, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

Nov. 2, 1988.

Frederic W. Schwartz, Jr., Washington, D.C. (Mark Friedman and Wechsler & Friedman, Rockville, on the brief), for appellants.

Marvin B. Miller (Miller, Markey and Hoffman, on the brief), Bladensburg, for appellee, Bill Cairns Pontiac of Marlow Heights, Inc.

Richard W. Goldman (E. Milton Farley, III, Patrick McGlone and Hunton & Williams, Washington, D.C., and John M. Thomas, Dearborn, Mich., on the brief), for appellee, Ford Motor Co.

Argued before GILBERT, C.J., ALPERT, J., and JAMES F. COUCH Jr., Associate Judge of the Court of Appeals (retired), Specially Assigned.

ALPERT, Judge.

In this products liability case the appellants, Gina and Leonard Harrison, appeal rulings by the Circuit Court for Prince George's County granting summary judgment for the defendants, Ford Motor Company and Bill Cairns Pontiac of Marlow Heights. Appellants contend that they produced sufficient evidence that a defect that existed in their 1978 Mercury Zephyr at the time of its manufacture by Ford caused a fire and resultant injuries to the plaintiffs some five years later. More specifically, they assert that:

The court improperly applied a plaintiff's burden of demonstrating no genuine issue in deciding defendants' motion for summary judgment.

On the facts and opinions alleged by the plaintiffs, and the reasonable inferences therefrom, summary judgment for defendants was inappropriate.

Even if Ford Motor Co. is entitled to summary judgment, Bill Cairns Pontiac of Marlow Heights, Inc. is clearly not.

We disagree with the Harrisons and shall affirm.

## FACTS

On September 21, 1982, the appellants purchased a used 1978 Mercury Zephyr from defendant Bill Cairns Pontiac. At the time of purchase the automobile had travelled 58,855 miles according to its odometer. Shortly thereafter, the appellants returned the car to Bill Cairns, complaining that

the tires were bald and of a mildewy smell emanating from an unknown source. The tires were replaced and the salesperson told the appellants that the smell was caused by the previous non-use of the airconditioning or heater and that it would go away.

On August 3, 1983, while Gina Harrison was driving through East Potomac Park in the District of Columbia, a fire ignited either within or behind the instrument panel on the dash of the vehicle. Gina Harrison was unable to stop the vehicle and exited the car prior to the vehicle's impact with a tree. She sustained bodily injuries. She sued Ford Motor Company and Bill Cairns Pontiac for damages and her husband, Leonard Harrison, also filed suit for loss of consortium.

The vehicle was examined by Greg Haas, an investigator for the plaintiffs. Haas stated both at his deposition and in his investigative report that the fire was caused by "an electrical short in the dashboard directly behind the instrument cluster." [1] Mr. Haas stated his reasons for this conclusion:

> Well, because all the wires were burnt and they were what was burnt most in the whole scenario, that is what I presumed was the central point of the fire. And then the second thing that I had to say or I had to figure to get that conclusion was that the only way that they would have caught on fire that way is through a short.

*Id.*

Soon after Haas' examination of the vehicle, the car was destroyed by the appellants or their insurer.

Dr. George Lear, appellants' second expert witness, was then deposed by the appellees. Because the automobile was

---

1. For the purposes of reviewing the order of summary judgment, Haas will be presumed to be an expert qualified to render an opinion as to the cause of the fire. The fact that he admitted that he has never held himself out as an expert in accident reconstruction or on the cause of fires in a court or other legal proceedings does not necessarily mean that he could not be qualified as such.

destroyed prior to his retention as an expert witness, Dr. Lear relied on Gina Harrison's deposition testimony, Haas' investigative report, and two photographs of the car in reaching his opinion that the fire was the result of a defect in the electrical system of the car. Pertinent excerpts of Lear's deposition testimony are as follows:

A. I have not reached a specific cause identity at this point, only that it's because of some defect associated with the vehicle. Cars shouldn't catch on fire going down the road and drop molten debris on people's feet.

Q. You'll have to be more specific about that. You have reached a conclusion that a defect in the car caused fire; is that correct?

A. Yes.

Q. And the basis for that conclusion is that cars don't drop molten material on people's feet?

A. That is the very minimum surface contention. Very few experts or laymen will say that cars should drop molten debris on feet while you're driving.

. . . . .

Q. Are you prepared today to state your opinion based on a reasonable degree of engineering certainty whether any alleged defect in the electrical system caused or contributed to the fire?

A. Yes.

Q. What is that opinion?

A. I am more than fifty percent certain that this was an electrical fire.

Q. And that is based on the driver's testimony that molten material dropped to her feet, on your review of the investigator's report and on your review of these photographs; is that correct?

A. Yes.

Q. Is there anything else that I have left out?

A. No.

Q. Now, Dr. Lear, with respect to the alleged electrical defect, do you know what that defect is?

A. No.

Q. How are you going to find out?

A. I don't know.

. . . . .

Q. I thought that I had previously asked you how you were going to find out what actually caused the electrical fire and you related at that time that you didn't know how you were going to find out what caused the fire.

A. Yes. I don't know that right now.

Q. But you had previously stated, I believe, that it is your opinion that the fire was caused by a defect in the automobile; is that correct?

A. Yes.

Q. Is that a manufacturing defect or a design defect?

A. I don't know.

. . . . .

Q. You don't know that one way or another?

A. I don't know that one way or another, but I am an expert in the area of automotive maintenance and that qualifies me to say what this frequency of maintenance is and the frequency of activity up underneath that dashboard.

Q. You didn't answer my question. Isn't it possible that faulty repair, if it took place in that area—obviously if it took place on the rear tire, it's not going to affect it—that faulty repair could have resulted in a problem that resulted in an electrical fire?

A. That is a possibility.

. . . . .

Q. Do you know on which side of the steering wheel, looking at what the driver would be looking at, the main wiring loom is routed in a 1978 Mercury Zephyr?

A. No.

Q. Do you know on which side the air conditioning motor is located?

A. No.

Q. Do you know from the same perspective where the air conditioning blower motor resistor wires are located?

A. No.

Q. Dr. Lear, what are the various possibilities with respect to the specific cause of the electrical fire in this vehicle?—and I am talking about specific wiring systems.

A. I am not at the point in my investigation where I would feel that it's appropriate to address that.

Q. What are you going to have to do to reach that point?

A. I don't know.

Q. Do you know whether or not the air conditioning blower motor resistor wires might have been responsible?

A. I don't know.

Lear deposition pp. 46, 50, 53, 57, 68–69.

No experts retained by the defendants have examined the vehicle because of its destruction. Appellants also rely on two recall orders from Ford Motor Company that applied to some 1978 Mercury Zephyrs. The unrefuted affidavit from a design analysis engineer at Ford Motor Company, however, indicates that the Harrisons' vehicle was manufactured several months subsequent to the vehicles that were subject to the recall order. (*See* Affidavit of Thomas Patterson.) No other evidence regarding the possibility of a defect has been produced by the Harrisons.

The Harrisons have attempted to impute liability to the defendants under several theories. These are (1) negligent manufacture and design, (2) breach of implied warranties of merchantability, (3) negligent failure to warn, and (4) strict liability.[2]

■ Although the substantive law of the District of Columbia, the situs of the injury, applies, "the sufficiency of evidence and permissibility of inferences are to be determined by the law of the forum, generally, and in *res ipsa*

---

**2.** Summary judgment on a fifth count for punitive damages is not opposed by the plaintiffs and is, therefore, not a proper subject for this appeal.

*loquitur* situations." *Joffre v. Canada Dry, Inc.*, 222 Md. 1, 7, 158 A.2d 631 (1960). *See also Vernon v. Aubinoe*, 259 Md. 159, 162, 269 A.2d 620 (1970) ("Maryland law ... controls as to the inferences to be drawn from the evidence, the sufficiency of the evidence, the inferences from it to go to the jury....").

*Negligent Manufacture and Design—Res Ipsa Loquitur*

■ Although the appellants have made some allusions as to the applicability of the doctrine of *res ipsa loquitur,* the inference of negligence created by that doctrine is not applicable here. Traditionally,

the three criteria necessary for successful reliance on the doctrine of res ipsa loquitur [are]:

1. A casualty of a sort which usually does not occur in the absence of negligence,

2. Caused by an instrumentality within the defendant's exclusive control,

3. Under circumstances indicating that the casualty did not result from the act or omission of the plaintiff.

*Giant Food, Inc. v. Washington Coca Cola Bottling Co.,* 273 Md. 592, 597, 332 A.2d 1 (1975); *Munzert v. American Stores Co.,* 232 Md. 97, 104, 192 A.2d 59 (1963); *Poiomac Edison Co. v. Burdette,* 70 Md.App. 566, 574, 521 A.2d 1276 (1987); and *C & P Telephone Company of Maryland v. Hicks,* 25 Md.App. 503, 516, 337 A.2d 744 (1975). Although application of the doctrine of *res ipsa loquitur* in this case could be attacked as to any of the three above mentioned required elements, the "instrumentality within the defendant's exclusive control" element is most obviously not met. Although Maryland courts do not apply the "exclusive control" test literally, the plaintiff must produce sufficient evidence tending to eliminate other causes, such as the absence of negligence, negligence of third parties, or the plaintiff's own alteration or misuse. *See Hicks, supra,* at

531–33, 337 A.2d 744. *See generally* Restatement (Second) of Torts, § 328D and comments f-g, i (1965).

Here, evidence concerning the vehicle's service history, accidents, or alterations before the appellants acquired the car is totally lacking. At the time of purchase, the vehicle was more than four years old, with over 58,000 miles on the odometer. The automobile had passed through at least one prior owner. Further, the record gives no indication as to the service history, accidents or possible alterations to the vehicle during the appellants' one year ownership. An opinion from one of the appellants' experts, Dr. Lear, during his deposition, to the effect that the area of the dashboard where the fire broke out is not generally serviced after 58,000 miles, (*see* Lear's Deposition, at 55–57), is mere conjecture in that it was not based on examination of the car itself, discussions with prior owners, or any other pertinent facts. Further, the following exchange occurred:

Q. You didn't answer my question. Isn't it possible that faulty repair, if it took place in that area—obviously if it took place on the rear tire, it's not going to affect it—that faulty repair could have resulted in a problem that resulted in an electrical fire?

A. That is a possibility.

*Id.* at 57. Such testimony is not sufficient to meet the "exclusive control" requirement for a *res ipsa loquitur* inference.

In *Jensen v. American Motors Corp.*, 50 Md.App. 226, 437 A.2d 242 (1981), the appellants sued the appellees for injuries resulting from a single vehicle accident. The driver of the vehicle testified that he had heard a squeal in the tires and that the vehicle had previously "swerved to the left a couple of times." *Id.* at 228, 437 A.2d 242. The vehicle was approximately 9 months old and had been driven approximately 10,000 miles. The court held that "[r]es ipsa loquitur does not apply." *Id.* at 232, 437 A.2d 242. Similarly, in other jurisdictions, courts have held that the inference created by the doctrine of *res ipsa loquitur* is not applicable where the age of the vehicle, coupled with the

plaintiff's failure to exclude sufficiently other causes of the accident not attributable to the defendant do not warrant the inference. *See Brandon v. Caterpillar Tractor Corp.,* 125 A.D.2d 625, 510 N.Y.S.2d 165 (N.Y.App.Div.1986) (explosion of 8–year–old bulldozer where employee of products distributor made several alterations three months prior does not warrant application of *res ipsa loquitur* against the manufacturer); *Wear v. Chenault Motor Co.,* 52 Ala.App. 382, 293 So.2d 298 (Civ.App.), *cert. denied,* 292 Ala. 756, 293 So.2d 301 (1974) ("Res ipsa loquitur does not apply as the necessary element of control had not been present for nearly a year, neither does the evidence disclose the cause of the fire."). Because the plaintiff has submitted no other evidence regarding the negligence of either Ford Motor Company or Bill Cairns Pontiac, summary judgment as to counts I and III of the complaint, alleging negligent manufacture and design and negligent failure to warn, respectively, was properly entered.

### *Ford's Liability Under Strict Liability Or Implied Warranty Theories*

The remaining theories of liability are breach of implied warranty of merchantability and strict liability. "To recover on either theory—implied warranty or strict liability—the plaintiff in a products liability case must satisfy three basics from an evidentiary standpoint: (1) the existence of a defect, (2) the attribution of the defect to the seller, and (3) a causal relation between the defect and the injury." *Virgil v. "Kash n' Karry" Service Corp.,* 61 Md.App. 23, 30, 484 A.2d 652 (1984), *cert. denied,* 302 Md. 681, 490 A.2d 719 (1985). Consequently, the appellants must present evidence sufficient for a jury inference that the vehicle was defective and that this defect existed at the time of manufacture.

An inference of a defect may be drawn from the happening of an accident, where circumstantial evidence tends to eliminate other causes, such as product misuse or alteration. *Id.* at 32, 484 A.2d 652. It is axiomatic, however, that "proof of a defect must arise above surmise,

conjecture, or speculation ...; and one's right to recovery may not rest on any presumption from the happening of an accident." *Jensen v. American Motor Corp.*, 50 Md.App. 226, 232, 437 A.2d 242 (1981). Factors to be considered in determining whether a product defect may be inferred from circumstantial evidence include:

> (1) expert testimony as to possible causes; (2) the occurrence of the accident a short time after the sale; (3) same accidents in similar products; (4) the elimination of other causes of the accident; (5) the type of accident that does not happen without a defect.

*Cornell Drilling Co. v. Ford Motor Co.*, 241 Pa.Super. 129, 359 A.2d 822, 827 (1976); Prosser, *Law of Torts*, § 103 at 673–74 (4th ed. 1971).

■ The appellants have produced some evidence that the cause of the fire in the 1978 Mercury Zephyr was an electrical short originating behind the instrument panel to the left of the steering wheel. The only testimony regarding the possibility of a defect in the electrical system is Dr. Lear's testimony that "[c]ars shouldn't catch on fire going down the road and drop molten debris on people's feet." Dr. Lear admitted later during his deposition that he did not know what the alleged electrical defect was, nor would he be able to determine that fact subsequently. Although Greg Haas, the other expert witness hired by the appellants, was able to reach a conclusion as to the origination of the fire, neither his investigative report, nor his testimony at deposition gives any indication that the electrical short was caused by a defect in the automobile that existed at the time of the sale by Ford Motor Company in 1978. In addition, by allowing the destruction of the vehicle by their insurance company, the plaintiffs have prevented the development of any further evidence with regard to any specific defect. As noted by the court in *Powe v. Wagner Electric Sales Corp.*, 589 F.Supp. 657 (S.D.Miss.1984), a plaintiff's failure to preserve the defective product places a heavy burden on the defendants, "[They] must defend against an allegation that [their] product was defective without know-

ing anything at all about that specific product and having no way to identify what defect is alleged to have caused [their] product to have failed." *Id.* at 661. Thus, without any direct evidence of a defect in the electrical system of the vehicle in question, the plaintiffs rely only upon the supposition of one of their expert witnesses that such a fire would not normally result in the absence of a product defect.

Appellants refer to several cases in other jurisdictions where evidence of an electrical short or existence of an electrical fire was sufficient to raise an inference of a product defect. *See, e.g., Guardian Ins. Co. v. Anacostia Chrysler Plymouth, Inc.,* 320 A.2d 315 (D.C.1974), *Vernon v. Lake Motors,* 26 Utah 2d 269, 488 P.2d 302 (1971); *Barnett v. Ford Motor Co.,* 463 S.W.2d 33, 35 (Tex.1970); *Losinski v. Ford Motor Co.,* 43 Mich.App. 114, 204 N.W.2d 49, 52 (1972); *Ford Motor Co. v. Pittman,* 227 So.2d 246, 250 (Fla.1969); *Jacobson v. Broadway Motors, Inc. and Ford Motor Co.,* 430 S.W.2d 602, 607 (Mo.1968); *Joe Sartain Ford, Inc. v. American Indemnity Co.,* 399 So.2d 281, 283 (Ala.1981). · In none of those cases was the automobile purchased more than 8-½ months prior to the accident. *But see Cincinnati Ins. Co. v. Volkswagen of America,* 29 Ohio App.3d 58, 502 N.E.2d 651 (1985) (fire occurred approximately five years after purchase after the car had been driven 70,000—80,000 miles). In most of the above cases, the automobile was purchased new and less than three months prior to the fire. To sustain the appellants' position would require the court to infer from the happening of the fire not only that a defect existed, but that the alleged defect existed at the time of manufacture nearly five years before the accident.

Professor Prosser has summarized the effect of lapse of time on any inference that the product was defective at the time of manufacture:

There is first of all the question of lapse of time and long continued use. This in itself will never prevent recovery where there is satisfactory proof of an original defect;

but when there is no such definite evidence, and it is only a matter of inference from the fact that something broke or gave way, the continued use usually prevents the inference that more probably than not the product was defective when it was sold. It has been said many times that the seller does not undertake to provide a product that will not wear out.

Prosser, *Law of Torts* § 103 at 674 (4th ed. 1971). Although this court has held that "the effect of time on causation is a factor to be considered by *the trier of fact* in determining the existence of a defect," *see Virgil, supra,* 61 Md.App. at 33, 484 A.2d 652 (emphasis added), the plaintiff's evidence in *Virgil,* "if believed by the trier of fact, tended to eliminate any likelihood that the defect ... was created after Mrs. Virgil purchased the thermos." *Id.* (a two to three month interval between purchase of a thermos and injury when thermos imploded). Consequently, the plaintiff's testimony in that case gave rise to a reasonable inference that the thermos was defective when she acquired it.

The Harrisons' evidence does not tend to eliminate the likelihood that a defect in the automobile, if any, was created after Ford's manufacture of the vehicle. The Harrisons' automobile was manufactured five years prior to the fire that destroyed it. At the time the Harrisons purchased the car—nearly a year before the fire—the vehicle had travelled more than 58,000 miles. With the possible exception of returning the car once several days subsequent to its purchase for an investigation of a "mildewy" smell, no evidence even remotely relating to a defect in the electrical system has been produced. Nothing is known of the operational history of the vehicle before the Harrisons purchased it. A reasonable factfinder could not draw an inference that the product was defective at the time of manufacture and, therefore, summary judgment is appropriate. *Accord Kuisis v. Baldwin–Lima–Hamilton Corp.,* 457 Pa. 321, 319 A.2d 914, 923 (1974) ("In most cases, the weighing of these factors should be left to the finder of fact. But in certain

situations the prolonged use factor may loom so large as to obscure all others in a case."); *Larson v. Thomashow,* 17 Ill.App.3d 208, 307 N.E.2d 707 (1974) (rejecting defendants' claim that the fact that a drive shaft of a General Motors vehicle fell out after two years and four months use established a prima facie case under both the doctrine of implied warranty and strict liability).

The plaintiff's evidence simply does not permit an inference that a defect existed at the time Ford manufactured the vehicle five years prior to the accident giving rise to the appellants' injuries. As the court in *Jensen, supra,* stated:

> [The appellants] have been unable to show that what might possibly have happened did probably happen. Reduced to its simplest form, their argument is that because a one-car accident happened without apparent cause, the manufacturer must be to blame. Such a theory is not supported by established principles of common-law negligence or strict liability or breach of warranty. It is simply wishful thinking.

*Id.* 50 Md.App. at 234–35, 437 A.2d 242. *Accord Powe v. Wagner Elec. Sales Corp.,* 589 F.Supp. 657 (S.D.Miss.1984); *Mixon v. Chrysler Corp.,* 281 Ark. 202, 663 S.W.2d 713 (1984); *Wear v. Chenault Motor Co.,* 52 Ala.App. 382, 293 So.2d 298 (Civ.App.), *cert. denied,* 293 So.2d 301 (Ala.1974); *Bass v. General Motors Corp.,* 447 S.W.2d 443 (Tex.Civ. App.1968); *Halsey v. Ford Motor Co.,* 24 A.D.2d 826, 264 N.Y.S.2d 16 (N.Y.1965), *aff'd,* 19 N.Y.2d 664, 278 N.Y.S.2d 856, 225 N.E.2d 549 (N.Y.1967); *Brandon v. Caterpillar Tractor Corp.,* 125 A.D.2d 625, 510 N.Y.S.2d 165 (N.Y.App. Div.1986). Therefore, summary judgment in favor of Ford Motor Co. was properly granted as to counts II and IV of the appellants' complaint, alleging breach of implied warranties and strict liability respectively.

### *Bill Cairns' Pontiac's Liability Under Strict Liability or Implied Warranty Theories*

 Although the parties do not discuss whether a used car dealer may be held liable under a strict liability

theory, the few courts that have examined the issue have found that in some circumstances a used car dealer may be held liable. *Court v. Grzelinski*, 72 Ill.2d 141, 19 Ill.Dec. 617, 618, 379 N.E.2d 281, 282 (1978); *Realmuto v. Straub Motors, Inc.*, 65 N.J. 336, 322 A.2d 440, 444 (1974). *See generally* Frumer & Friedman, *Products Liability*, § 3.03[4][b][iv] (1987). In *Realmuto*, the court limited its holding by providing that "a used car dealer ought to be subject to strict liability in tort with respect to any defective work repairs or replacements *he* has done or made...." *Id.* at 444 (emphasis added). The *Grzelinski* court opined, "'To the extent that plaintiff alleges that the defects were created not only by the manufacturer, but also by work defectively done by [the used car dealer], his complaint satisfies the requirements...." *Id.* 379 N.E.2d at 282, 19 Ill.Dec. at 618. We agree that a dealer in used products should not, in most instances, be held strictly liable for a product defect created by the manufacturer. Hence, the appellants must present evidence that Bill Cairns' Pontiac created the defect responsible for their injuries.

Here, the appellants' evidence does not present a submissible jury question that Bill Cairns Pontiac created a defect that caused the appellants' injuries. Neither Ford Motor Company, nor the appellants, have offered any evidence as to any alteration or modification by Bill Cairns. Although the appellants returned to Bill Cairns shortly after the purchase with complaints about bald tires and a mildewy smell coming from the heater/air conditioning unit, no evidence exists that Bill Cairns Pontiac knew or should have known of any problem with the electrical system. *See Petrus Chrysler–Plymouth v. Davis*, 283 Ark. 172, 671 S.W.2d 749 (1984) (upholding used car dealer's liability under strict liability theory where there was evidence that the dealership knew of the wiring defect). The appellants do present some evidence of a recall applicable to some 1978 Mercury Zephyrs, but Thomas Patterson's undisputed affidavit provides that the recall order applied to models produced before the Harrisons' automobile was manufactured.

Thus, summary judgment was properly granted as to the strict liability count against Bill Cairns Pontiac. *See generally* Note, *Strict Liability Not Applicable to Used Car Dealers Absent Actual Creation of Defect*, 25 DePaul L.Rev. 574 (1976).

Similarly, the appellants' breach of implied warranty of merchantability claim must also fail due to the lack of evidence concerning the existence of a defect or attribution of the alleged defect to Bill Cairns Pontiac. The passage of one year's time between purchase and injury, coupled with the fact that the appellants have not produced legally sufficient evidence concerning the cause of the electrical fire, or that sufficiently eliminates non-liability causes of the fire, lead to the conclusion that the trial court was correct in entering summary judgment for Bill Cairns Pontiac. Without sufficient evidence of a defect, a breach of implied warranty of merchantability claim in a products liability case cannot be presented to a jury.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANTS.