Alva WATSON, et al.

v.

**SUNBEAM CORPORATION, et al.**

**Civ. No. JFM–91–2422.**

United States District Court,
D. Maryland.

March 1, 1993.

*Walker,* [76 U.S.] 9 Wall 282, 288, 19 L.Ed. 576 (1870). These statutes provide predictability by specifying a limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced. *Marion,* 404 U.S. at 322, 92 S.Ct. at 464. The Defendant in this case has argued convincingly his unawareness of the charges pending against him. The expiration of the statute of limitations on the offense before the Defendant was arrested [gives] him an irrebuttable presumption that his right to a fair trial has been prejudiced.

Moreover, because dismissal of the Indictment in this case is premised on grounds, independent of "error, defect, or irregularity with respect to the grand jury" or for any other reason stated in 18 U.S.C. § 3288, its savings provision does not apply in this case. *See U.S. v. Bortnovsky,* 683 F.Supp. 449, 451 (S.D.N.Y.1988) (*relying on United States v. Peloquin,* 810 F.2d 911 (9th Cir.1987)). This Court agrees with the reasoning of the *Bortnovsky* and *Peloquin* courts "that dismissal for failure to meet the Speedy Trial Act [or for Fifth and Sixth Amendments violations] is [not] dismissal because of a defect or insufficiency of the Indictment itself so as to invoke the savings provisions of 18 U.S.C. § 3288 ..." *Bortnovsky,* 683 F.Supp. at 451.

Mark Mullen, Philadelphia, PA, William Hewitt, Silver Spring, MD, for plaintiff.

John Boyd, Jr., Smith, Somerville & Case, Baltimore, MD, for defendant.

## MEMORANDUM

MOTZ, District Judge.

On September 11, 1988 a fire broke out at the home of Alva and Victoria Watson. The fire originated in a childrens' bedroom where an electric blanket allegedly had been in operation on the lower bunk bed. The Watsons' three children were all sleeping in the bedroom at the time. Fortunately, the children escaped unharmed but the fire caused extensive property damage in the alleged amount of $350,000.

The Watsons have brought this suit against Sunbeam Corporation, the manufacturer of the electric blanket, and Sears & Roebuck Co., the retail seller of the blanket. The Maryland Casualty Company, which insured the Watsons' home is the subrogee of the bulk of the Watsons' claim. Mr. Watson is also seeking damages for the underinsured portion of a decoy collection which was destroyed in the fire. Discovery has been completed, and defendants have moved for summary judgment.

### I.

The Watsons purchased a Model 7060 Sunbeam electric blanket from Sears for one of their sons, Brian, which was delivered to them on or about November 20, 1987. From that date to the date of the fire the blanket had worked effectively and had not required any repairs.

There is conflicting evidence as to whether, in violation of a warning contained on the blanket's label, the Watsons had permitted the power cord and wires of the blanket to become crossed, trapped or pinched. Although an investigative report states that Mrs. Watson stated that she regularly tucked the blanket in, she has testified on deposition that she always made sure that the blanket was laying freely across the bed in such a way that only its ends were tucked in with the power cord going over the bed into the outlet. The evidence is not disputed that, in violation of another warning, the blanket was used on a bunk bed. However, on deposition Sunbeam's corporate designee testified that the purpose of that warning is to protect against the power cord becoming stuffed down the side of the railing, and it is undisputed that there was no railing on the lower part of the bunk bed where Brian slept.

On the night of the fire the Watsons put their children to bed at approximately 9:00 p.m. The oldest child, Carmen, age eleven, was in her room, and Alva, III, age ten, and Brian, age eight, in their room. Alva was on

the top bunk and Brian on the bottom. Brian was chilly and, according to the Watsons, was using the electric blanket which was plugged in along a wall at the foot of the bed.[1]

Sometime between 9:00 and 10:00 p.m. Carmen woke up and went in to sleep with her brothers, climbing onto the top bunk with Alva. After falling asleep, Carmen was awakened by the sound of the smoke detector. According to her deposition testimony, there was "a lot" of fire in the bottom bunk bed "and the blanket where Brian was laying, the blanket was all on fire, and it was like making the top bunk be on fire from underneath." Alva and Carmen pulled Brian out of his bed and dragged him out of the room. The blanket was at the bottom of the bed, Brian had not been burned. The children ran upstairs, and Mrs. Watson called 911 and took the children outside. Mr. Watson went to the childrens' bedroom to put out the fire. When he entered the room, the bed and the walls of the bedroom in the corner where the bed was located were on fire. Mr. Watson was unsuccessful in his efforts, and the fire eventually was extinguished by firefighters who arrived on the scene.

On the night of the fire Deputy Firemarshal Maurice Cox conducted an initial investigation which led him to conclude that "the fire started on the lower bed and as the fire progressed, it engulfed and totally destroyed the upper bed. It burned upward." He later prepared a supplemental report where he concluded "that the most probable cause of the fire is an electric blanket, however, it could not be determined whether [the blanket] malfunctioned or it was the result of the blanket being balled up." Approximately six months later, after having received a hearsay report that the fire was caused by one of the boys playing with matches, Cox issued a second supplemental report which stated that "the possibility of the boy [Brian] playing with matches can not be eliminated nor can the possibility of the electric blanket starting the fire be eliminated." The Watson children have been deposed, and all of them have denied playing with matches on the night of the fire.

■ On September 19, 1988, approximately one week after the fire, Maryland Casualty retained David J. Malberg, a fire investigator who formerly worked in the public sector and who now operates his own investigative consulting business. Malberg visited the scene on September 22, 1988. By that time most of the few items of potential interest to experts which remained after the fire had been discarded.[2] After conducting his investigation, Malberg reported that "[b]ased on the physical evidence and information from the sources, this investigator has determined that the fire started in the basement rear left-middle bedroom, in the bottom bunk near the foot of this bed.... The cause of this fire was attributed to the electric blanket overheating and igniting itself and other bedding nearby."

In May 1992 plaintiffs retained Paul Kaczmarczik, an electrical engineer who has had prior experience in cases involving electric blankets. Based upon a review of photographs of the small portions of the blanket

1. Defendants appear to be questioning whether the blanket was in fact being used on September 11, 1988. They point out that Brian's brother was using a fan and that, according to official weather information, the temperature on September 11th was 72° F at 7:00 p.m. and 64° F at 10:00 p.m. Any such contention, of course, presents a dispute of fact.

2. Defendants contend that they have been prejudiced by the destruction of evidence over which the Watsons and Malberg had control. Although most of the blanket was destroyed in the fire, there were certain items (such as the plug left in the wall receptacle believed to have been the blanket's power supply cord) which plaintiffs and their representatives could have preserved. However, there are factual disputes as to whether the Watsons or the firefighters were responsible for discarding the bulk of the charred remains, and the fire itself destroyed most of the components which were of potential interest. Under these circumstances plaintiffs are correct in contending that although defendants are entitled to a jury instruction on the question of the spoilation of evidence, any inference to be drawn from the spoilation is not sufficiently strong to warrant the entry of summary judgment on behalf of plaintiffs. *See generally Larsen v. Romeo*, 254 Md. 220, 228, 255 A.2d 387, 391 (1969); *Jensen v. American Motors Corp.*, 50 Md.App. 226, 228–29, 437 A.2d 242, 246 (1981); *DiLeo v. Nugent*, 88 Md.App. 59, 71, 592 A.2d 1126, 1132 (1991).

which survived the fire, the reports of Cox and Malberg and schematics of the Model 7060 electric blanket, Kaczmarczik has expressed an opinion that design defects of the blanket probably caused the fire. He identified five design flaws in the blanket and has testified that the most probable cause for the fire here in question was inadequate protection in the blanket where wires connected to a terminal block.

## II.

In order to prevail on a product liability claim a plaintiff must show: (1) the existence of a defect; (2) the attribution of the defect to the seller; and (3) a casual relation between the defect and the injury.[3] *Tauber v. Nissan Motor Corp., USA,* 671 F.Supp. 1070, 1073 (D.Md.1987) *citing Jensen v. American Motors,* 50 Md.App. 226, 234, 437 A.2d 242, 247 (1981). A product may be considered defective for one of the following three reasons: (1) a flaw in the product at the time defendant sold it resulting in a more dangerous product than intended, (2) failure by the producer to adequately warn of a risk or hazard related to the product's design and (3) defect in product's design. *Simpson v. Standard Container Co.,* 72 Md.App. 199, 527 A.2d 1337, 1339–40 (1987), *cert. denied,* 311 Md. 286, 533 A.2d 1308 (1987).

Here, plaintiffs are alleging that the electric blanket was defective for all three reasons. However, they have produced no evidence to demonstrate that there was any manufacturing defect or that any alleged inadequacy in the warnings caused the fire.[4] Thus, plaintiffs' only potentially viable claim is one for defective design.

Plaintiffs concede that they cannot pinpoint a design defect which caused the fire. They also acknowledge that, as is well established, recovery in a products liability case cannot be predicated upon a presumption from the mere happening of an accident. *See, e.g., Giant Food, Inc. v. Washington Coca–Cola Bottling Co.,* 273 Md. 592, 609, 332 A.2d 1, 11 (1975); *Lee v. Baxter Healthcare Corp.,* 721 F.Supp. 89, 96 (D.Md.1989), *aff'd mem.,* 898 F.2d 146 (4th Cir.1990). They contend, however, that they can meet the burden of proof indirectly by presenting expert testimony as to possible causes of the fire and evidence of such other factors as the occurrence of the accident a short time after sale, involvement of the same product in similar accidents, the elimination of other causes of the accident and the fact that the type of accident in question does not ordinarily happen without a product defect existing. *See Harrison v. Bill Cairns Pontiac, Inc.,* 77 Md.App. 41, 549 A.2d 385, 390 (1988), quoting *Cornell Drilling Co. v. Ford Motor Co.,* 241 Pa.Super. 129, 359 A.2d 822, 827 (1976).

### A. *Expert Testimony As To Possible Causes*

As indicated above, Paul Kaczmarczik, the electrical engineer retained by plaintiffs, has identified five design defects which exist in the Model 7060 electric blanket. He has specified one of these defects (alleged inadequate protection where wires are connected to a terminal block) as the defect which most probably caused the fire.

Defendants contend that Kaczmarczik's opinion is legally insufficient because its only basis is that the fire occurred. They point out that in response to the question "You can't tell me whether there was a defect in the wire or the terminal block," Kaczmarczik responded: "No. I'm saying there had to be in order for the blanket to cause the fire. That's the best I can do at this time." If Kaczmarczik is, in fact, relying solely upon

---

**3.** The elements of proof are the same whether the claim be characterized as one for strict liability or negligence, *see, e.g., Singleton v. International Harvester Co.,* 685 F.2d 112, 117 (4th Cir.1981), or breach of warranty. *See, e.g., Frericks v. General Motors Corp.,* 274 Md. 288, 336 A.2d 118 (1975) (cited by *Tauber,* 671 F.Supp. at 1073).

**4.** Plaintiffs do suggest, as a defense to defendants' allegation that the placement of the blanket on a bunk bed constituted a misuse of the product, that the warning label was inadequate because it did not state the reason that the blanket should not be used on a bunk bed. However, not only have plaintiffs not produced any evidence to show that the fire was caused by the use of the blanket on a bunk bed, they emphasize the absence of any such evidence.

the happening of the fire as his basis for inferring the existence of a defect, defendants' contention is correct. If such reliance were permitted, a plaintiff could circumvent the rule that a defect cannot be inferred from the occurrence of an accident simply by producing an expert who would himself make that inference.

■ I am satisfied, however, after reading the entirety of Kaczmarczik's deposition testimony that he may not be basing his opinion as to the existence of a defect solely upon the occurrence of the fire.[5] He explained in some detail the reasons that he believed that the blanket was defective. It appears that what he may have meant in giving the testimony which I have quoted is not that he was inferring the existence of a defect from the occurrence but rather that he was inferring from the occurrence the fact that the defect which he identified was its cause. That is a significant distinction which lies at the heart of the difference between the evidence necessary to "directly prove" a causal design defect and the lesser evidence required to meet the "possible cause" factor of the *Harrison* indirect scheme of proof.

### B. *The Timing Of The Accident*

■ In *Virgil v. "Kash N' Karry" Service Corp.,* 61 Md.App. 23, 484 A.2d 652 (1985), *cert. denied, "Kash N' Karry" Service Corp. v. Virgil,* 302 Md. 681, 490 A.2d 719 (1985), the Maryland Court of Special Appeals held that the passage of only three months between the purchase of a thermos and its implosion was a factor which could give rise to an inference of defect. In *Harrison,* the court indicated that the passage of five years between the manufacture of a vehicle and the occurrence of the accident was too long to

permit such an inference.[6] The court did not, however, specify what the outermost limit is and indicated that normally "the effect of time on causation is a factor to be considered by the trier of fact in determining the existence of a defect." *Harrison,* 77 Md.App. at 53, 549 A.2d at 391 (*quoting Virgil,* 61 Md.App. at 33, 484 A.2d at 657). In the present case the blanket was received by the Watsons on November 20, 1987, and the fire occurred on September 11, 1988, approximately ten months later. Under *Harrison* and *Virgil* it is well within the province of the jury to determine what inference, if any, to draw under these circumstances.

### C. *Similar Accidents Involving the Same Product*

The record reflects that in 1987 and 1988 6,192 Model 7060 blankets were sold by Sunbeam to Sears, that prior to the institution of this action, Sunbeam had received no claims against a Model 7060 blanket and that since this action was filed Sears has received only one such claim. The record is devoid of any evidence concerning the circumstances of that claim.

### D. *The Elimination Of Other Causes*

Defendants identify two possible causes of the fire other than a defect in the blanket: the children playing with matches or the wires and cord of the blanket having become crossed, trapped or pinched. Genuine disputes of fact exist as to both of these issues. The Watson children have testified unequivocally that they were not playing with matches on the night of the fire, and Mrs. Watson has testified that she made sure that the wires

---

5. Of course, after hearing Kaczmarczik's testimony, the jury may find that Kaczmarczik is inferring that a defect exists solely from the occurrence of the fire. Since plaintiffs have not presented any other expert who is qualified to express any opinion as to any defect in the blanket, at trial defendants will be entitled to an instruction that if the jury so finds, their verdict should be for the defendants.

6. As defendants point out, one of the defendants in *Harrison* was a dealer who had sold as a used car the vehicle involved approximately one year

prior to the accident. The Court of Special Appeals affirmed a summary judgment which had been entered on behalf of the dealer (as well as on behalf of the manufacturer), and defendants contend that this indicates that the one-year period is insufficient to give rise to an inference of defect. I am not persuaded on this score. Not only did the court not address the question, it also made an alternative holding that the dealer was entitled to summary judgment on the ground that there was no evidence that it had been responsible for the alleged defect.

and cords of the blanket were unobstructed when the blanket was in use.

### E. *The Nature Of The Accident*

The final factor of *Harrison's* five-factor test is whether the accident is "of the type ... that does not happen without a defect." 77 Md.App. at 51, 549 A.2d at 390. It is not entirely clear what this factor comprehends. Does it mean that the accident is of a type that does not happen without a defect regardless of whether other causes are eliminated? Or does it mean that the accident is of a type that does not happen without a defect after other causes are eliminated? Stated more concretely in the context of this case, is the "accident" to be considered (1) a fire in a bed over which an electric blanket is laying, or (2) a fire in a bed over which an electric blanket is laying and where all other possible causes of the fire other than a defect in the blanket have been eliminated?

Rudimentary logic dictates the conclusion that the former meaning is the one intended. If a product (at least one which is mass produced, not experimental and recently manufactured) is involved in an accident and if all other possible causes of the accident are eliminated, the inference is almost inescapable that the product is defective. Thus, if the fifth *Harrison* factor is understood as having that meaning, it would have the effect of permitting a defect to be inferred from the occurrence of the accident in violation of the well established principle to the contrary.[7] In other words, the exception would swallow the rule. On the other hand, if the former meaning is intended, the factor does add something to the test; the nature of the accident tends to confirm plaintiffs' elimination of other possible causes.

Accordingly, I read the fifth factor in *Harrison* to mean that even if other causes are not eliminated, the accident is of a type that does not ordinarily happen unless a defect exists. Accidents involving imploding bottles provide an example of such an accident. Ob-

viously, however, fires can occur in beds over which an electric blanket is laying without there being any defect in the blanket. Kaczmarczik's own deposition confirms this to be true since he testified that in approximately 50% of the cases in which he has been retained to investigate fires where electric blankets are involved, he has determined that the blanket was not defective.

 In summary, viewing the evidence most favorably to plaintiffs, three of the *Harrison* factors favor plaintiffs (expert testimony of possible causes, the timing of the accident and the elimination of other causes), one is essentially neutral (the involvement of the same product in similar accidents) and one favors defendants (the type of accident). Against this background I cannot say that a rational jury could not return a verdict in favor of plaintiffs. Accordingly, defendants are not entitled to the summary judgment which they seek.

---

**7.** This fallacy is reflected in plaintiffs' argument in this case. In addressing the fifth *Harrison* factor, they assert: "It certainly must be true that a blanket marketed for children, which will envelope them while they sleep, should not catch fire without a defect." If that assertion were sufficient to meet the fifth factor, the rule against inferring a defect from the occurrence of an accident would be a chimera.