FRANKLIN R. DeWITT v. EVEREADY BATTERY CO., INC.

No. 329A01

(Filed June 28, 2002)

**1. Products Liability; Warranties— implied warranty of merchantability—circumstantial evidence of breach**

A plaintiff does not need to prove a specific defect to carry his or her burden of proof in a products liability action based upon a breach of implied warranty of merchantability and the burden sufficient to raise a genuine issue of material fact in such a case may be met if the plaintiff produces adequate circumstantial evidence of a defect. This evidence may include certain enumerated factors, and, when a plaintiff seeks to establish a case by means of circumstantial evidence, the trial judge is to consider these factors initially and determine whether they are sufficient as a matter of law to support a finding of breach of warranty. The plaintiff does not have to satisfy all of the factors and, if the judge determines that the case may be submitted to the jury, the weighing of the factors should be left to the finder of fact.

**2. Products Liability; Warranties— implied warranty of merchantability—circumstantial factors—malfunction of product**

In an action arising from a burn allegedly received from leaking D batteries, plaintiff presented a genuine issue of material fact concerning whether the batteries malfunctioned with plaintiff's testimony that he purchased the batteries in their original blister packaging; read the instructions accompanying a lantern; inserted the batteries into the lantern; and tested the lantern for only five minutes, all on the day of purchase; removed the batteries within twenty-four hours after purchasing them; and two of the batteries had leaked.

**3. Products Liability; Warranties— implied warranty of merchantability—circumstantial factors—expert testimony**

In an action arising from a burn allegedly received from leaking D batteries, plaintiff's expert's testimony was sufficient to raise a genuine issue of material fact regarding defendant manufacturer's responsibility for defects which were possible causes of the leakage.

DeWITT v. EVEREADY BATTERY CO.

[355 N.C. 672 (2002)]

**4. Products Liability; Warranties— implied warranty of merchantability—circumstantial factors—use of product and timing of malfunction**

In an action arising from a burn allegedly received from leaking D batteries, there was evidence presenting a genuine issue of material of fact such that a reasonable person might find that plaintiff put the batteries to their ordinary use when he was injured in plaintiff's testimony that he read the instructions accompanying the lantern relating to the placement of the batteries and knew that inserting them backwards could be dangerous, that he was familiar with handling batteries through his work, and that plaintiff had been kidded in his workplace for his caution in handling batteries. As to the timing of the malfunction, the failure happened shortly after plaintiff purchased the batteries and did no more than test them briefly, and did not occur some extended period of time after the batteries were made or plaintiff first obtained the product.

**5. Products Liability; Warranties— implied warranty of merchantability—circumstantial factors—similar accidents**

In an action arising from a burn allegedly received from leaking D batteries, there was sufficient evidence to raise a genuine issue of material fact regarding the possibility of other similar incidents where defendant's witness testified that leaking batteries had been made, that there had been "a fairly serious problem" relating to the venting mechanism, and plaintiff's attorney presented documents relating to occasions when design and manufacturing specifications had not been met. ·

**6. Products Liability; Warranties— implied warranty of merchantability—circumstantial factors—elimination of other possibilities**

In an action arising from a burn allegedly received from leaking D batteries, defendant's suggestion that an error plaintiff may have committed led to the injury did not rise to a level requiring the trial court to conclude as a matter of law that plaintiff failed to negate a reasonable secondary cause. A plaintiff is required to present a case-in-chief that either contains no evidence of reasonable secondary causes or negates any such evidence that was initially present and need not actively eliminate the possibility of reasonable secondary causes.

**7. Products Liability; Warranties— implied warranty of merchantability—circumstantial factors—whether accident occurs without manufacturing defect**

There was evidence of a genuine issue of material fact in an action arising from a burn allegedly received from leaking D batteries such that a reasonable person could conclude that a defect in the batteries caused plaintiff's injuries where defendant's witness testified to a simulation in which batteries were placed in a lantern backwards and did not leak. However, a careful review of the evidence of this factor is required.

Justice PARKER concurring in the result only.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 144 N.C. App. 143, 550 S.E.2d 511 (2001), affirming in part and reversing and remanding in part an order for summary judgment entered 7 March 2000 by Doughton, J., in Superior Court, Iredell County. Heard in the Supreme Court 13 November 2001.

*Homesley, Jones, Gaines, Homesley & Dudley, PLLC, by Clifton W. Homesley and Andrew J. Wingo, for plaintiff-appellee.*

*Templeton & Raynor, P.A., by Kenneth R. Raynor, for defendant-appellant.*

EDMUNDS, Justice.

This products liability action was brought by plaintiff, Franklin Roland DeWitt, against defendant, Eveready Battery Company, Inc., for injuries plaintiff sustained when alkaline batteries manufactured by defendant leaked battery fluid onto plaintiff's ankle. The sole issue presented for this Court's review is whether the Court of Appeals erred in reversing the trial court's entry of summary judgment in favor of defendant on plaintiff's claim that defendant breached the implied warranty of merchantability by manufacturing defective batteries. For the reasons that follow, we hold that summary judgment was improperly entered for defendant on this issue; therefore, we affirm the Court of Appeals.

Taken in the light most favorable to plaintiff, the evidence shows that on 10 December 1995, plaintiff purchased a Coleman battery-powered lantern and eight Eveready "Energizer" size D batteries from a Wal-Mart store in Mooresville, North Carolina. The batteries, manu-

factured by defendant, were sold in sealed packages containing two batteries each. Plaintiff read the instructions accompanying the lantern explaining proper battery installation. He did not remember if these instructions included warnings of potential hazards that could result from incorrect battery placement, nor did he read or see any warnings on the battery packages or on the batteries themselves. However, because his occupation involved installing fire alarms and security systems, he was familiar with the characteristics of such batteries. He knew that it could be dangerous to install the batteries incorrectly and that the contents of damaged or leaking batteries could cause injury.

Plaintiff inserted the eight batteries in the bottom of the lantern. Although he did not notice specifically whether he aligned the batteries correctly, he assumed he did so because he had "put so many batteries in and out of things over the years with raising kids and everything." Plaintiff then operated the lantern for approximately five minutes. He was not satisfied with the meager illumination provided by the lantern, however, so he set it aside.

The next day, plaintiff decided to remove the batteries and return the lantern. At that point, the batteries had been in the lantern for approximately twenty-four hours. Plaintiff held the lantern between his ankles for three to four minutes while he removed the batteries. As he did so, he noticed fluid on some of the batteries. As plaintiff stated during his deposition, "I noticed on one for sure, there was like a slimy feeling." Plaintiff also noticed some "slimy" moisture on the bottom of the lantern. However, he did not realize that the moisture on the batteries or the lantern came from the batteries themselves. Instead, he "didn't know if it was like . . . condensation or what it could be" and simply washed his hands.

Shortly thereafter, plaintiff felt a tingling on his ankle and noticed that it was slightly red. Because he was not in any discomfort and had not experienced any tingling in his fingers prior to washing his hands, he thought he had been bitten by an insect. He also noticed that his sock was moist[1] but, because the weather was warm, assumed the moisture came from perspiration. He added, "The last place I would have thought it [had come] from was the batteries." Accordingly, he did not wash his ankle or remove his sock, but put the lantern back

---

1. As noted by the Court of Appeals, plaintiff made inconsistent statements as to whether he noticed moisture on his sock prior to leaving for Wal-Mart or upon his return home from the store. However, this discrepancy is not material to our analysis of plaintiff's claim.

DeWITT v. EVEREADY BATTERY CO.

[355 N.C. 672 (2002)]

in its box and returned it to Wal-Mart. He kept the batteries and later gave them to his attorney.

While driving home, plaintiff felt an uncomfortable warm sensation, "almost like a burning," on his ankle. Once inside his house, he removed his right shoe and sock and discovered that the entire heel of his right foot was black. Plaintiff did not realize that the injury had been caused by leakage from the batteries, but instead thought that he had contracted a flesh-eating disease.

Plaintiff was treated in the emergency room of Lake Norman Regional Medical Center, where tests of the lesions on plaintiff's foot showed a pH level of 11 to 11.5.[2] Plaintiff and medical personnel "finally put two and two together that [plaintiff's injuries led] back to the batteries," and plaintiff was diagnosed with having third- and fourth-degree alkaline chemical burns to his right ankle caused by potassium hydroxide, a chemical that leaked from the batteries. As a result of his injuries, plaintiff has undergone surgeries on his ankle, requiring skin grafts from his thighs and wrist.

On 10 September 1997, plaintiff filed a complaint against defendant, setting out products liability claims based on theories of breach of warranty and negligence. As to the former, plaintiff alleged that defendant breached the implied warranty of merchantability by manufacturing a defective product and by manufacturing a product containing an inadequate warning; as to the latter, plaintiff alleged that defendant was negligent by manufacturing a defective product and by placing inadequate warnings on the batteries. Plaintiff also alleged that defendant manufactured a product with an inadequate design. Defendant filed its answer on 5 November 1997, denying all material allegations and claiming several alternative defenses, including misuse of the batteries, alteration or modification of the batteries, use of the batteries contrary to express instructions or warnings of which plaintiff knew or with the exercise of reasonable care should have known, inconsistent use of the batteries, contributory negligence, and failure to mitigate damages.

Several witnesses provided affidavits or gave deposition testimony on behalf of plaintiff. Joseph Crawford Hubbell, a chemist and bacteriologist, testified that he performed tests for pH and alkalinity on one of the batteries used by plaintiff and on the sock plaintiff was

---

2. As explained by various witnesses, the pH level of a substance is a measure of its acidity. A level of 7 is approximately neutral, while a level of 12 to 14 is highly caustic.

wearing at the time of his injury. The surface of the battery yielded a pH of 11.20 and an alkalinity of 10.6, and the sock yielded a pH of 10.10 and an alkalinity of 7.10. Hubbell stated that these high pH and alkalinity levels "would be very corrosive" in contact with skin. He also added that the results of the tests of plaintiff's skin at Lake Norman Regional Medical Center were consistent with his findings as to the battery and the sock. Finally, he noted that a new battery just removed from its package would have a neutral pH reading of approximately 7.0 and that leakage from a battery would be the main cause of high pH and high alkalinity levels on the surface of a battery.

William Wayne Beaver, P.E., an electrical engineer specializing in forensic analysis of failed structures and products, gave deposition testimony describing the design of the Eveready "Energizer" size D battery as follows:

There's an anode and a cathode. The anode generally contains a brass nail that fits into the negative—I'll call that the cap of the battery. The cathode is the can around the battery, which a top is attached to; positive terminal, if you will.

There are chemicals inside the battery that cause a reaction; a donating of electrons, if you will. I believe the anode material is a zinc powder. I believe the cathode material is a manganese dioxide and carbon. And there is an electrolyte solution that is a basic, and I think it's a potassium hydroxide solution in water that is near the anode.

Beaver also described an automatic venting mechanism built into each battery. This mechanism is designed to relieve dangerously high pressure in a battery by piercing the battery casing, allowing the pressure to dissipate at the expense of also allowing the contents of the battery to leak.

And there is a non-woven separator between the anode and cathode inside the battery. There is a plastic, perhaps nylon, disk that separates the anode and the cathode that also serves a purpose of expanding, if there is internal pressure[]. There is a—that is one part of the venting mechanism. The other part [is] metal spurs that will puncture this seal and venting plastic disk and allow any chemicals to come out of the battery should it have excessive pressure inside the battery.

DeWITT v. EVEREADY BATTERY CO.

[355 N.C. 672 (2002)]

Beaver examined and took X rays of the eight batteries used by plaintiff in the Coleman lantern. He testified that leakage had occurred[3] and opined that several possibilities could explain the leakage. Two of these possibilities were manufacturing defects: either (1) a small hole in the positive metal case or negative metal top on the batteries, or (2) a gap or tear in the nonmetallic insulating seal between the positive metal case and the negative metal top (in other words, a loose connection where the batteries were crimped). Another possible cause of leakage was an increase of pressure in the battery. Such an increase can result from creating a charge if a battery is installed backwards, that is, with the positive and negative ends pointed in the incorrect direction. Although Beaver agreed with defendant's counsel that initiation of the venting mechanism in the batteries would be "strong evidence that the batter[ies] worked as [they were] supposed to," he later added that an activated venting mechanism could work improperly by venting at the wrong place if part of the battery casing is thinner than designed. Beaver also stated that the venting mechanism could have operated at too low a pressure (for example, if the spurs are too long, they could have penetrated the disk at a pressure lower than that specified for the battery) or that the chemicals in the batteries could have been of the wrong mixture, causing an increase in pressure and subsequent venting. Ultimately, though, Beaver could not tell from the X rays where the leakage originated, whether the venting mechanism in the batteries had been initiated, or whether the batteries vented properly or instead leaked as the result of a defect. He stated that he needed to conduct intrusive testing in order to reach such conclusions.

Dr. Richard G. Pearson, a professor of industrial engineering at North Carolina State University, submitted a detailed affidavit relating to the adequacy of the warning on the batteries used by plaintiff. Based on his review of depositions and case materials, Pearson observed that plaintiff's work made him familiar with the proper usage of batteries and the hazards that could arise from their misuse. He noted his opinion that plaintiff acted reasonably. Pearson also stated that the labeling of the batteries failed to address the specific consequences of chemical exposure and the actions a user should take upon exposure. He added that these warnings failed to comply with industry practice, published standards, and the federal code. Pearson also expressed concerns that defendant has no written pol-

---

3 Beaver was not asked, and did not volunteer, how many of the batteries had leaked. However, he testified that two of the eight batteries were of low weight.

icy or procedure for the design of warnings and the content of hazard labels, does not test warning comprehension by consumers, and emphasizes marketing rather than industry standards and practice in determining the format of warnings.

In addition to his deposition testimony described above, plaintiff submitted an affidavit in which he stated: (1) "I was aware at the time of my injury that aged batteries could in some way be dangerous"; (2) "I did not know that newly purchased batteries could leak within 30 hours after taking them out of the package"; (3) "I did not know that the substance from the inside of an Energizer D cell battery could soak through my clothes without burning or discoloring the cloth"; (4) "I did not know that the substance from the inside of an Energizer D cell battery could cause the 3rd and 4th degree burns that I received when the substance soaked through my sock and came into contact with my skin"; and (5) "though I did not particularly look for warnings on the package or the batteries themselves, the warnings were so inconspicuous that they did nothing to draw my attention to them."

Terrance N. Telzrow, defendant Eveready's manager of standards, product safety, and environmental affairs, was the only witness who gave deposition testimony on behalf of defendant. Telzrow's description of the composition and function of a size D alkaline battery was similar to that provided by Beaver. Telzrow described the venting apparatus as a safety device in the battery that "activates at a pressure well below the pressure at which the battery would explode and throw out shrapnel." Because the venting mechanism pierces the battery to allow gas to escape, Telzrow added that the fluid contents of the battery may also leak out. Telzrow noted, however, that the venting mechanism does not activate immediately upon the buildup of pressure but is "directly related to the current that's pushed through the battery in the charging condition."

During his deposition, Telzrow listed four circumstances that can lead to an increase in pressure in a battery and cause the venting mechanism to activate: (1) recharging the battery; (2) putting a battery in backwards, which results in "charging" or "forc[ing]" a current in . . . the opposite way in which it was designed"; (3) mixing old and new batteries, which causes "driving into reverse" when the "voltage switches [and] the positive becomes a negative and the negative becomes a positive"; and (4) gross contamination in the battery. Although Telzrow stated that neither he nor his assistants conducted intrusive or destructive examination of the batteries used by plaintiff,

they took photographs and X rays of the batteries, weighed them, tested the open and closed circuit voltage of the batteries, and recorded the manufacturing date of the batteries. They determined that two of the batteries had low weight and observed from the X rays that these two batteries contained bulges as "a result of internal pressure built up in the battery." From this examination, Telzrow concluded that the venting mechanism activated properly in the two batteries and was of the opinion that the two batteries leaked as a result of being "charged" or placed backwards in the Coleman lantern.

On 2 September 1999, defendant filed a motion for summary judgment. The motion was heard at the 28 February 2000 session of Superior Court, Iredell County, and on 7 March 2000, the trial judge, having considered the pleadings, discovery, and affidavits detailed above, entered an order granting summary judgment in favor of defendant. Plaintiff appealed, and in a divided opinion, the Court of Appeals affirmed the entry of summary judgment in favor of defendant on the issues of inadequate warning, inadequate design, and negligence. However, the Court of Appeals reversed the trial court as to the issue of defendant's breach of implied warranty of merchantability by manufacturing defective batteries and remanded the case to the superior court for trial on this issue. The majority of the Court of Appeals addressed plaintiff's ability to show a defect in the product and held that "a product defect may be inferred from evidence the product was put to its ordinary use and the product malfunctioned." *DeWitt v. Eveready Battery Co.*, 144 N.C. App. 143, 150, 550 S.E.2d 511, 516 (2001). The Court of Appeals then held that, considering the evidence in a light most favorable to plaintiff, a reasonable person could find that plaintiff properly placed the batteries into the lantern and thus put the batteries to their ordinary use at the time of his injury, and that the leakage of fluid from the batteries was a malfunction of the batteries. The court concluded that because this evidence was sufficient to raise a genuine issue of material fact as to whether the batteries were defective, summary judgment was improperly allowed as to this issue.

The dissenting judge focused solely on the issue of defendant's breach of implied warranty of merchantability and argued that plaintiff had failed to produce substantial evidence of the batteries' defect. The dissenter contended there was no evidence that the batteries malfunctioned because "in fact, every indication was that they operated properly by activating the safety 'venting' mechanism when pressure began to build in the batteries." *Id.* at 158, 550 S.E.2d at 521. The

dissenter also focused on plaintiff's "assumption" that he inserted the batteries properly and argued that: "This [assumption] does not, in my belief, constitute the 'substantial evidence' which is necessary to defeat a motion for summary judgment." *Id.* at 159, 550 S.E.2d at 521. Accordingly, the dissenting judge would have affirmed the trial judge's grant of summary judgment as to all issues.

Defendant appeals to this Court on the basis of the dissent. On 22 August 2001, this Court denied plaintiff's petition for discretionary review as to the additional issues of defendant's inadequate warning and inadequate design.

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (1999) (amended 2000). Although "[d]etermining what constitutes a genuine issue of material fact is often difficult," *Marcus Bros. Textiles v. Price Waterhouse, LLP*, 350 N.C. 214, 220, 513 S.E.2d 320, 325 (1999), this Court has stated that an issue is genuine if it is supported by substantial evidence, *Koontz v. City of Winston-Salem*, 280 N.C. 513, 518, 186 S.E.2d 897, 901 (1972), and "[a]n issue is material if the facts alleged would constitute a legal defense, or would affect the result of the action, or if its resolution would prevent the party against whom it is resolved from prevailing in the action," *id.* " 'Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' " *Thompson v. Wake Cty. Bd. of Educ.*, 292 N.C. 406, 414, 233 S.E.2d 538, 544 (1977) (quoting *State ex rel. Comm'r of Ins. v. N.C. Fire Ins. Rating Bureau*, 292 N.C. 70, 80, 231 S.E.2d 882, 888 (1977)), and means "more than a scintilla or a permissible inference," *Utilities Comm'n v. Great S. Trucking Co.*, 223 N.C. 687, 690, 28 S.E.2d 201, 203 (1943).

The party moving for summary judgment bears the burden of establishing that there is no triable issue of material fact. *Nicholson v. American Safety Util. Corp.*, 346 N.C. 767, 774, 488 S.E.2d 240, 244 (1997). This burden may be met "by proving that an essential element of the opposing party's claim is non-existent, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of his claim or cannot surmount an affirmative defense which would bar the claim." *Collingwood v. General Elec. Real Estate Equities, Inc.*, 324 N.C. 63, 66, 376 S.E.2d 425, 427 (1989). Once the moving party satisfies these tests, the burden shifts

to the nonmoving party to "produce a forecast of evidence demonstrating that the [nonmoving party] will be able to make out at least a prima facie case at trial." *Id.* The trial judge must consider all the presented evidence "in a light most favorable to the nonmoving party," *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001), and "[a]ll inferences of fact must be drawn against the movant and in favor of the nonmovant," *Roumillat v. Simplistic Enters., Inc.*, 331 N.C. 57, 63, 414 S.E.2d 339, 342 (1992). In addition, because summary judgment is " 'a somewhat drastic remedy, it must be used with due regard to its purposes and a cautious observance of its requirements in order that no person shall be deprived of a trial on a genuine disputed factual issue.' " *Marcus Bros. Textiles v. Price Waterhouse, LLP*, 350 N.C. at 220, 513 S.E.2d at 325 (quoting *Kessing v. National Mortgage Corp.*, 278 N.C. 523, 534, 180 S.E.2d 823, 830 (1971)). With these principles in mind, we now turn to defendant's appeal.

This case is governed by North Carolina's Products Liability Act, which is codified in chapter 99B of the North Carolina General Statutes. N.C.G.S. ch. 99B (1995) (amended effective 1 January 1996 for causes of action arising on or after that date). Under the Act, a "product liability action" is defined as "any action brought for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design, formulation, development of standards, preparation, processing, assembly, testing, listing, certifying, warning, instructing, marketing, selling, advertising, packaging or labeling of any product." N.C.G.S. § 99B-1(3). Pursuant to the Act, a plaintiff may base a products liability action against a manufacturer or seller on contract principles of breach of warranty. *Tetterton v. Long Mfg. Co.*, 314 N.C. 44, 50, 332 S.E.2d 67, 71 (1985) ("[o]n the face of this statute, it seems evident that this [A]ct . . . was meant and intended to apply to manufacturers and retail sellers alike"); *see also* N.C.G.S. § 99B-1.2 (2001) ("nothing [in the North Carolina Products Liability Act] shall preclude a product liability action that otherwise exists against a manufacturer or seller for breach of warranty"). Where the action is for breach of implied warranty brought by the buyer against a manufacturer, privity is not required. N.C.G.S. § 99B-2(b); *see also Tetterton v. Long Mfg. Co.*, 314 N.C. at 51, 332 S.E.2d at 71. In this case, because plaintiff did not bring suit against Wal-Mart, the retail seller, our analysis focuses solely on defendant manufacturer's liability.

An action for breach of implied warranty of merchantability is established by N.C.G.S. § 25-2-314 of the North Carolina Uniform

Commercial Code and "is a 'product liability action' within the meaning of the Products Liability Act if, as here, the action is for injury to [a] person . . . resulting from a sale of a product." *Morrison v. Sears, Roebuck & Co.*, 319 N.C. 298, 303, 304, 354 S.E.2d 495, 498, 499 (1987) ("the General Assembly, when enacting the Products Liability Act after the Uniform Commercial Code had been adopted, did not intend that the two acts be mutually exclusive, but intended an harmonious integration of the two"). Section 25-2-314 provides, in pertinent part:

> (1) Unless excluded or modified (G.S. 25-2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . .
>
> (2) Goods to be merchantable must be at least such as
>
>> (a) pass without objection in the trade under the contract description; and
>>
>> . . . .
>>
>> (c) are fit for the ordinary purposes for which such goods are used . . . .

N.C.G.S. § 25-2-314(1), (2)(a), (2)(c) (2001). To establish a breach of implied warranty of merchantability under the statute, a plaintiff must prove the following elements: (1) " 'that the goods bought and sold were subject to an implied warranty of merchantability' "; (2) " 'that the goods did not comply with the warranty in that the goods were defective at the time of sale' "; (3) " 'that his injury was due to the defective nature of the goods' "; and (4) " 'that damages were suffered as a result.' " *Morrison v. Sears, Roebuck & Co.*, 319 N.C. at 301, 354 S.E.2d at 497 (quoting *Cockerham v. Ward*, 44 N.C. App. 615, 624-25, 262 S.E.2d 651, 658 (1980)). "The burden is upon the purchaser to establish a breach by the seller of the warranty of merchantability [in this case, defendant manufacturer] by showing that a defect existed at the time of the sale." *Cockerham v. Ward*, 44 N.C. App. at 625, 262 S.E.2d at 658 (citing *Rose v. Epley Motor Sales*, 288 N.C. 53, 61, 215 S.E.2d 573, 578 (1975)). Here, the parties do not dispute that the first, third, and fourth elements have been established in plaintiff's allegations. At issue is the second element, whether the batteries were defective at the time of sale.

Plaintiff does not argue that this element has been satisfied by evidence of a specific defect in the batteries, but instead asserts that a defect may be inferred from evidence that the batteries were put to their ordinary use and subsequently malfunctioned. Citing *Red Hill Hosiery Mill, Inc. v. MagneTek, Inc.*, 138 N.C. App. 70, 530 S.E.2d 321 (2000), the Court of Appeals accepted this contention, stating, "A product defect may be shown by evidence a specific defect existed in a product. Additionally, when a plaintiff does not produce evidence of a specific defect, a product defect may be inferred from evidence the product was put to its ordinary use and the product malfunctioned." *DeWitt v. Eveready Battery Co.*, 144 N.C. App. at 150, 550 S.E.2d at 516. We agree.

Although this Court has never explicitly so held, a number of our decisions have approved the use of circumstantial evidence under analogous circumstances. In *Bernick v. Jurden*, 306 N.C. 435, 293 S.E.2d 405 (1982), the plaintiff was injured in a hockey game when his mouth guard shattered after being hit by another player's hockey stick. One of the plaintiff's claims against the defendant manufacturer and the defendant seller of the mouthguard was for breach of implied warranty of merchantability. As to this issue, the defendants argued that the plaintiff's allegations of a defective condition were insufficient because they were "based solely upon the fact that the mouthguard broke." *Id.* at 450, 293 S.E.2d at 415. We rejected the defendants' contention and held that summary judgment in favor of the defendants was inappropriate. *Id.* In *Rose v. Epley Motor Sales*, 288 N.C. 53, 215 S.E.2d 573, the plaintiff purchaser sued the defendant sellers of an automobile for breach of implied warranties of merchantability and fitness for a particular purpose. Citing the sections of the Uniform Commercial Code applicable to implied warranties, we held:

> [T]he evidence is sufficient to show the plaintiff purchased a used automobile from the defendant dealer in such commodities, that nothing whatever was . . . done to the automobile after the sale which altered its condition, that at all times following the sale the plaintiff operated it in a normal and proper manner, that three hours after the sale, while it was being so operated, it was totally destroyed by a fire originating in its motor compartment and that on the following day the plaintiff demanded rescission of the contract of sale, which demand the defendant refused. From the facts shown by the plaintiff's evidence, taken to be true, it may reasonably be inferred that the vehicle sold to him by the

defendants was not in condition suitable for ordinary driving at the time of the sale, three hours before the fire.

. . . .

. . . The burden is upon the buyer to establish a breach by the seller of the warranty of merchantability; that is, to show that the defect which caused the fire existed at the time of the sale. The evidence in the record is sufficient to permit an inference to this effect, but it does not compel such a finding even if true and the credibility of the plaintiff's evidence is for the jury.

*Id.* at 59, 61, 215 S.E.2d at 577, 578 (citation omitted). Accordingly, we held that the defendants' motion for directed verdict at the conclusion of the plaintiff's evidence was properly denied. In *Jones v. Siler City Mills, Inc.*, 250 N.C. 527, 108 S.E.2d 917 (1959), the plaintiff brought suit against the defendant for negligence and breach of express and implied warranties, arguing that the chicken feed the defendant sold to the plaintiff was unsuitable for laying chickens. Noting that the issues submitted on appeal related to the alleged breach of implied warranty, we held that "[w]hen considered in the light most favorable to plaintiff, we are of the opinion that the circumstantial evidence, together with the opinion testimony of [plaintiff's experts], was sufficient to support a finding that the feed consumed by plaintiff's hens contained [an inappropriate additive]. Hence, defendant's motion for judgment of nonsuit was properly overruled." *Id.* at 532, 108 S.E.2d at 920.

This rule, allowing a plaintiff to prove a product defect circumstantially, has been accepted by a majority of jurisdictions that have considered the issue. The leading case espousing this principle is *Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 161 A.2d 69 (1960), in which the New Jersey Supreme Court held that, as to the plaintiffs' breach of implied warranty of merchantability claim against the defendant automobile manufacturer, "[i]n our view, the total effect of the circumstances shown from purchase to accident is adequate to raise an inference that the car was defective and that such condition was causally related to the mishap. Thus, determination by the jury was required." *Id.* at 409, 161 A.2d at 97 (citations omitted). The court cited the following circumstances in making its decision:

The proof adduced by the plaintiffs disclosed that after servicing and delivery of the car, it operated normally during the succeeding ten days, so far as the [plaintiffs] could tell. They had

DeWITT v. EVEREADY BATTERY CO.

[355 N.C. 672 (2002)]

no difficulty or mishap of any kind, and it neither had nor required any servicing. It was driven by them alone. The owners service certificate provided for return for further servicing at the end of the first 1,000 miles—less than half of which had been covered at the time of [the plaintiff driver's] injury.

The facts, detailed above, show that on the day of the accident, ten days after delivery, [the plaintiff] was driving in a normal fashion, on a smooth highway, when unexpectedly the steering wheel and the front wheels of the car went into the bizarre action described. Can it reasonably be said that the circumstances do not warrant an inference of unsuitability for ordinary use against the manufacturer and the dealer? Obviously there is nothing in the proof to indicate in the slightest that the most unusual action of the steering wheel was caused by [the plaintiff driver's] operation of the automobile on this day, or by the use of the car between delivery and the happening of the incident. Nor is there anything to suggest that any external force or condition unrelated to the manufacturing or servicing of the car operated as an inducing or even concurring factor.

*Id.* at 409-10, 161 A.2d at 97-98. The New Jersey court cited several cases to support its holding and noted that "[a]lthough these latter cases sound in negligence, the test for finding a jury question in them is even more stringent. Circumstantial evidence sufficient to create a jury question as to the negligence of a manufacturer or dealer would clearly justify the same result where the issue is breach of warranty." *Id.* at 412, 161 A.2d at 99.

The court's holding in *Henningsen*, allowing use of circumstantial evidence to establish a defect, has subsequently been referred to both as the "malfunction theory" and as the "indeterminate defect theory." The Pennsylvania Superior Court discussed this theory in detail in several cases:

When advancing a theory of strict product liability, a plaintiff has the burden of showing that the product was defective, that the defect was the proximate cause of his or her injuries and that the defect existed at the time the product left the manufacturer. *Woodin v. J.C. Penney Co., Inc.*, 427 Pa. Super. 488, 490, 629 A.2d 974, 975 (1993)[, *appeal denied*, 537 Pa. 612, 641 A.2d 312 (1994)]. In certain cases of alleged manufacturing defects, however, the plaintiff need not present direct evidence of the defect. When proceeding on a malfunction theory, the plaintiff may "present a

case-in-chief evidencing the occurrence of a malfunction and eliminating abnormal use or reasonable, secondary causes for the malfunction." *O'Neill v. Checker Motors Corp.*, 389 Pa. Super. 430, 435, 567 A.2d 680, 682 (1989). From this circumstantial evidence, a jury may be permitted to infer that the product was defective at the time of sale. . . .

> . . . Although proof of a specific defect is not essential to establish liability under this theory, the plaintiff cannot depend upon conjecture or guesswork. "The mere fact that an accident happens, even in this enlightened age, does not take the injured plaintiff to the jury." *Stein v. General Motors Corp.*, 58 [Pa.] D. & C.2d 193, 203 (Bucks [County] 1972), *aff'd [per curiam]*, 222 Pa. Super. 751, 295 A.2d 111 (1972).

[*Woodin v. J.C. Penney Co., Inc.*], 427 Pa. Super. at 492, 629 A.2d at 975-976. The malfunction theory, thus, does not relieve the burden of establishing a defect. However, "[t]he malfunction itself is circumstantial evidence of a defective condition . . . ." *D'Antona v. Hampton Grinding Wheel Co., Inc.*, 225 Pa. Super. 120, 124, 310 A.2d 307, 309 (1973).

*Ducko v. Chrysler Motors Corp.*, 433 Pa. Super. 47, 50-51, 639 A.2d 1204, 1205-06 (1994) (citations omitted); *accord Dansak v. Cameron Coca-Cola Bottling Co.*, 703 A.2d 489, 495-96 (Pa. Super. 1997), *appeal denied*, 556 Pa. 676, 727 A.2d 131 (1998).

Thus, in a products liability case the plaintiff seeks to prove, through whatever means he or she has available under the circumstances of the case, that a product was defective when it left the hands of the manufacturer. In some cases, the plaintiff may be able to prove that the product suffered from a specific defect by producing expert testimony to explain to the jury precisely how the product was defective and how the defect must have arisen from the manufacturer or seller. In cases of a manufacturing defect, such expert testimony is certainly desirable from the plaintiff's perspective, but it is not essential. The plaintiff, even without expert testimony articulating the specific defect, may be able to convince a jury that the product was defective when it left the seller's hands by producing circumstantial evidence. Such circumstantial evidence includes (1) the malfunction of the product; (2) expert testimony as to a variety of *possible* causes; (3) the timing of the malfunction in relation to when the plaintiff first obtained the product; (4) similar accidents involving the same

product; (5) elimination of other possible causes of the accident; and (6) proof tending to establish that the accident does not occur absent a manufacturing defect. However the plaintiff chooses to present his or her case, the goal is the same: to prove that the product was not only defective, but that such a defect existed when it left the hands of the seller.

*Dansak v. Cameron Coca-Cola Bottling Co.*, 703 A.2d at 496 (citation omitted). The Pennsylvania Supreme Court adopted this reasoning in *Rogers v. Johnson & Johnson Prods., Inc.*, 523 Pa. 176, 565 A.2d 751 (1989). *See also Ruiz v. Otis Elevator*, 146 Ariz. 98, 703 P.2d 1247 (Ct. App. 1985); *Williams v. Smart Chevrolet Co.*, 292 Ark. 376, 730 S.W.2d 479 (1987); *Peris v. Western Reg'l Off-Track Betting Corp.*, 255 A.D.2d 899, 680 N.Y.S.2d 346 (1998).

We note that the cases cited immediately above discuss the use of circumstantial evidence in the context of strict liability. North Carolina has not adopted the law of strict liability in products liability actions, *Smith v. Fiber Controls Corp.*, 300 N.C. 669, 678, 268 S.E.2d 504, 509-10 (1980); *see also* N.C.G.S. § 99B-1.1 (2001), and we cite these cases from other jurisdictions for the sole purpose of establishing that the use of circumstantial evidence has been found proper in cases involving warranty issues. Thus, even though *Dansak* applied the malfunction theory to products liability claims based upon strict liability, the theory frequently has been extended to claims of breach of implied warranty of merchantability.

In a typical case involving a claim for breach of implied warranty of merchantability, the plaintiff will attempt to establish the precise manner in which the product failed. However, sometimes the product will be destroyed in the accident, or proof of how the product failed to operate safely will otherwise be unavailable. In such "malfunction" cases, the plaintiff may still rely on the merchantability warranty and need not necessarily show with particularity the precise nature of the defect or the precise physical mechanism which caused the product to fail. . . . Thus, it is sufficient . . . for the plaintiff merely to show the malfunction, regardless of the cause. As expressed by one court, "When machinery 'malfunctions[,]' it obviously lacks fitness regardless of the cause of the malfunction. Under the theory of warranty, the 'sin' is the lack of fitness as evidenced by the malfunction itself rather than some specific dereliction by the manufacturer in constructing or designing the machinery."

DeWITT v. EVEREADY BATTERY CO.

[355 N.C. 672 (2002)]

1 David G. Owen et al., *Madden & Owen On Products Liability* § 4:7, at 152-53 (3d ed. 2000) (quoting *Greco v. Bucciconi Eng'g Co.*, 283 F. Supp. 978, 982 (W.D. Pa. 1967), *aff'd*, 407 F.2d 87 (3d Cir. 1969)); *see also Cooper v. Ingersoll Rand Co.*, 628 F. Supp. 1488, 1495 (W.D. Va. 1986) (holding as to plaintiff's breach of implied warranty of merchantability claim that "[u]nder Virginia law breach of warranty may be established by circumstantial evidence, but the evidence must be sufficient to establish that the result alleged is a probability rather than a mere possibility"). All other states in the Fourth Circuit have reached the same conclusion. *Harrison v. Bill Cairns Pontiac of Marlow Heights, Inc.*, 77 Md. App. 41, 50, 549 A.2d 385, 390 (1988) (noting that under either a strict liability or breach of implied warranty of merchantability theory, "[a]n inference of a defect may be drawn from the happening of an accident, where circumstantial evidence tends to eliminate other causes, such as product misuse or alteration"); *Doty v. Parkway Homes Co.*, 295 S.C. 368, 370, 368 S.E.2d 670, 671 (1988) (holding that "[a] plaintiff may establish a breach of . . . implied warranty [of merchantability] by circumstantial evidence"); *Southern States Coop. Inc. v. Doggett*, 223 Va. 650, 657, 292 S.E.2d 331, 335 (1982) (noting "this is a circumstantial evidence case; and breach of warranty may be established by such evidence"); *Anderson v. Chrysler Corp.*, 184 W. Va. 641, 646, 403 S.E.2d 189, 194 (1991) (holding that a breach of warranty may be proved by circumstantial evidence); *see also Dietz v. Waller*, 141 Ariz. 107, 112, 685 P.2d 744, 749 (1984) (stating that "[t]he issue of breach of implied warranty here depends on virtually the same elements as the strict liability claim, namely the existence of a defect at the time of sale and the defect causing damages during ordinary use," and holding that a plaintiff may rely on circumstantial evidence in proving a defect under either theory).

[1] We join these other jurisdictions in holding that a plaintiff need not prove a specific defect to carry his or her burden of proof in a products liability action based upon a breach of implied warranty of merchantability. Accordingly, the burden sufficient to raise a genuine issue of material fact in such a case may be met if the plaintiff produces adequate circumstantial evidence of a defect. .This evidence may include such factors as: (1) the malfunction of the product; (2) expert testimony as to a possible cause or causes; (3) how soon the malfunction occurred after the plaintiff first obtained the product and other relevant history of the product, such as its age and prior usage by plaintiff and others, including evidence of misuse, abuse, or

similar relevant treatment before it reached the defendant; (4) similar incidents, " 'when[] accompanied by proof of substantially similar circumstances and reasonable proximity in time,' " *Jenkins v. Harvey C. Hines Co.*, 264 N.C. 83, 85-86, 141 S.E.2d 1, 3 (1965) (quoting *Styers v. Winston Coca-Cola Bottling Co.*, 239 N.C. 504, 508, 80 S.E.2d 253, 256 (1954)); (5) elimination of other possible causes of the accident; and (6) proof tending to establish that such an accident would not occur absent a manufacturing defect. *See Hamilton v. Emerson Elec. Co.*, 133 F. Supp. 2d 360, 365 (M.D. Pa. 2001); *Harrison v. Bill Cairns Pontiac of Marlow Heights, Inc.*, 77 Md. App. at 51, 549 A.2d at 390; *Dansak v. Cameron Coca-Cola Bottling Co.*, 703 A.2d at 496. When a plaintiff seeks to establish a case involving breach of a warranty by means of circumstantial evidence, the trial judge is to consider these factors initially and determine whether, as a matter of law, they are sufficient to support a finding of a breach of warranty. The plaintiff does not have to satisfy all these factors to create a circumstantial case, *Watson v. Sunbeam Corp.*, 816 F. Supp. 384, 389 (D. Md. 1993), and if the trial court determines that the case may be submitted to the jury, " '[i]n most cases, the weighing of these factors should be left to the finder of fact,' " *Woodin v. J.C. Penney Co.*, 427 Pa. Super. at 492, 629 A.2d at 976 (quoting *Kuisis v. Baldwin-Lima-Hamilton Corp.*, 457 Pa. 321, 336, 319 A.2d 914, 923 (1974)). We now apply these principles to the case before us.

1. Malfunction

**[2]** Plaintiff testified that he purchased the batteries, which were contained in their original blister packaging; read the instructions accompanying the lantern; inserted the batteries in the lantern; and tested the lantern for only five minutes, all on the day of purchase. He removed the batteries within twenty-four hours after purchasing them. Although the batteries were brand new and used for but a minimal time, two leaked. Viewing all facts and inferences in plaintiff's favor, we hold this evidence presents a genuine issue of material fact such that a reasonable person could find that the batteries at issue malfunctioned.

2. Expert Testimony

**[3]** Plaintiff's expert, William Beaver, testified at his deposition that there were several possible explanations for the batteries' leakage. Two of the possible explanations were manufacturing defects, described in the facts of this opinion, while another possibility was misuse by plaintiff. Beaver also described several ways that a battery

could malfunction even if the venting mechanism had been initiated. We hold this testimony was sufficient to raise a genuine issue of material fact such that a reasonable mind might accept that there were possible causes of the leakage attributable to defects, which were defendant's responsibility.

### 3. Use of the Batteries and Timing of the Malfunction

[4] In his deposition, plaintiff indicated that he was not certain whether he put the batteries into the lantern correctly but that he knew which end of a battery was the positive end and, based on his experience, assumed he placed them in the lantern correctly.

Q. Did you notice whether you put them all in correctly or did you not pay any attention to that?

A. No, I always pay attention to that because I know the side with the dimples is always your positive side on a battery. And that was towards your plus on the device you're installing it in.

Q. As you—and when did you notice that? When you were putting the batteries in or taking them out?

A. What was that?

Q. Notice that you had all the batteries in the right way.

A. I don't even think I really looked to notice, to say honestly.

Q. Just assume you'd done it right?

A. Yeah, yeah, I've put so many batteries in and out of things over the years with raising kids and everything.

Q. So I take it after you put them in there and the light wasn't bright enough, you didn't double check to make sure they were all in right.

A. I can't really say for sure that I did or not.

Defendant argues that plaintiff's "assumption" that he placed the batteries into the lantern correctly is fatal to his claim because it does not constitute substantial evidence necessary to survive a motion for summary judgment. We note that neither plaintiff nor defendant presented evidence as to whether the lantern would illuminate *at all* if one or more batteries were inserted backward. Despite this deficiency in the record, we believe plaintiff presented sufficient additional circumstantial evidence to support his assumption that he

positioned the batteries correctly. He testified that he read the instructions accompanying the lantern relating to placement of the batteries in the lantern and knew that inserting them backwards could be dangerous because "the current isn't flowing [in] the direction that the batteries would accept." He also testified that he was familiar with handling batteries through his work installing fire alarms and security systems, "usually working with batteries a couple times a week." When asked if he was familiar with procedures for disposing of batteries, he responded affirmatively, stating:

> This was more my caution than anything. I always wore a pair of gloves when I took the old batteries out because a lot of times they are corroded from age and we always took them back to the office where we had a pallet that they recycled.
>
> . . . .
>
> . . . I didn't want to touch a battery that was damaged or leaking or anything[.]
>
> . . . .
>
> . . . [P]eople used to kid me because I'd go get my gloves.

In addition, plaintiff submitted the affidavit of Pearson, who observed that plaintiff

> [i]n his job as an installer of security systems, . . . had gained knowledge of battery installation and associated hazards, precautions in use, and remedial action to take in case of exposure.
>
> . . . .
>
> . . . I believe [plaintiff's] actions were that of a reasonable person. In his job he did wear gloves to protect his skin from chemical contact.

Viewing this evidence in a light most favorable to plaintiff and drawing all inferences in his favor, we hold this evidence presents a genuine issue of material fact such that a reasonable person might find that plaintiff put the batteries to their ordinary use when he was injured.

As to the timing of the malfunction, plaintiff presented evidence that he removed the batteries in question from their packaging and tried them out in his new Coleman lantern. Despite this minimal

DeWITT v. EVEREADY BATTERY CO.

[355 N.C. 672 (2002)]

usage, two batteries leaked almost immediately. Telzrow, defendant's only deposition witness, noted that the batteries in question were manufactured in August 1995 and agreed that they were unusually new, stating, "In this particular case [plaintiff] got very fresh batteries." Accordingly, the malfunction did not occur some extended period of time after the batteries were made or after plaintiff first obtained the product, nor did it occur after prolonged or stressful use of the product. Instead, the failure happened shortly after plaintiff purchased the batteries and did no more than test them briefly.

4. Similar Accidents Involving the Same Product

[5] During his deposition, Telzrow acknowledged that defendant has made defective batteries in the past:

Q. Is it fair to say then that batteries could leak without being abused?

A. Sure. You can make a defective battery.

Q. And is it also fair to say that [defendant] has made defective batteries which have gone out for sale to the public?

A. Sure.

Telzrow added that "[c]omplaints are generally [that] the product leaked," and described "a fairly serious problem" related to the venting mechanism in the past where batteries manufactured by defendant had leaked within six to nine months after defendant shipped the batteries to a retailer. In addition, during Telzrow's deposition, plaintiff's attorney presented numerous documents obtained from defendant that related to various stages of the making of an "Energizer" size D alkaline battery. Several of these documents showed instances where defendant's design and manufacturing specifications had not been met, with battery failure or leakage being possible results. As to these documents, Telzrow stated:

Q. Am I correct in also stating that there are instances where those measurements fall outside of [defendant's] established range?

A. That's correct.

Q. And since—taking into consideration that those tests are random samples, is it conceivable that a battery, a D cell battery,

could leave this plant with components that exceed the measurement guidelines that have been established by [defendant]?

A. That's correct.

We hold this evidence was sufficient to raise a genuine issue of material fact such that a reasonable mind might conclude that there is a possibility of other incidents similar to that which befell plaintiff.

### 5. Elimination of Other Possible Causes

[6] Defendant argues that plaintiff must eliminate the possibility that he incorrectly "charged" the batteries before he can establish by inference a defect in the batteries. We do not adopt this suggestion, but instead adopt the holding in *Dansak v. Coca-Cola Bottling Co.* as follows:

> "[I]n plaintiff's case-in-chief, plaintiff [need not] negate every theoretically conceivable secondary cause for the malfunction. Rather . . . the plaintiff fails to establish a prima facie case only if the plaintiff does not negate evidence of other reasonable, secondary causes or abnormal use that is actually introduced during plaintiff's case-in-chief."

*Dansak v. Cameron Coca-Cola Bottling Co.*, 703 A.2d at 497 (quoting *Schlier v. Milwaukee Elec. Tool Corp.*, 835 F. Supp. 839, 841 (E.D. Pa. 1993)) (alterations in original). Indeed, "[s]ummary judgment is not warranted simply because the defendant hypothesizes (or even presents evidence of) reasonable secondary causes." *Id.* Accordingly, "a plaintiff need not look to actively 'eliminate' the possibility of reasonable secondary causes. He is merely required to present a case-in-chief that either contains no evidence of reasonable secondary causes or negates any such evidence that was initially present." *Hamilton v. Emerson Elec. Co.*, 133 F. Supp. 2d at 366. Plaintiff's deposition testimony does not present evidence of a secondary cause of the leakage unrelated to defendant. Instead, defendant suggests that an error plaintiff may have committed led to plaintiff's injury. This suggestion does not rise to the level requiring the trial court to conclude as a matter of law that plaintiff failed to negate a reasonable secondary cause.

### 6. Proof Tending to Establish that the Accident Does Not Occur Absent a Manufacturing Defect

[7] Finally, evidence was presented that the accident would not have occurred even if plaintiff did install the batteries backwards. Telzrow

and his staff simulated the circumstances of the accident for defendant by purchasing a duplicate lantern at Wal-Mart and placing two "Energizer" size D batteries into the lantern backwards while placing the other six batteries into the lantern correctly. Telzrow testified that the simulated test was conducted "to determine the current when one or more batteries is reversed to see if our analysis of how long it would take the vent to react is consistent with what [plaintiff] is saying it took to burn him." Although Telzrow is not sure how long his employee simulated the test, he did know that the employee took it past the peak current and let it stabilize. Notably, when asked if he knew whether "any of the batteries leak[ed] under those simulated conditions," Telzrow responded, "No." Telzrow later added that defendant had never received any reports that a battery had leaked while it was being used in a Coleman lantern.

Viewing all of these circumstances in a light most favorable to plaintiff and drawing every reasonable inference in his favor, we hold that this evidence presents a genuine issue of material fact such that a reasonable person could conclude that a defect in the batteries caused plaintiff's injuries. Accordingly, we affirm the holding of the Court of Appeals. Nevertheless, we caution that "because of the almost infinite possibility for slight factual differences in the circumstances surrounding a product liability case," James E. Beasley, *Products Liability and the Unreasonably Dangerous Requirement*, at 355-56 (1981), a careful review of the evidence is required of the trial judge in each case where a plaintiff relies on the malfunction principle, as "seemingly small variations in facts have [led] to diametrically opposite results," *id.*

AFFIRMED.

Justice PARKER concurring in the result only.

The sole issue before this Court is whether plaintiff has made a showing that defendant breached the implied warranty of merchantability sufficient to overcome defendant's motion for summary judgment. A warranty of merchantability is implied in every contract for sale. N.C.G.S. § 25-2-314(1) (2001). To prove that this warranty has been breached,

"a plaintiff must prove, first that the goods bought and sold were subject to an implied warranty of merchantability; second, that the goods did not comply with the warranty in that the goods

were defective at the time of sale; third, that his injury was due to the defective nature of the goods; and fourth, that damages were suffered as a result. *Tennessee-Carolina Transportation, Inc. v. Strick Corp.*, 286 N.C. 235, 210 S.E.2d 181 (1974); *Burbage v. Atlantic Mobilehome Suppliers Corp.*, 21 N.C. App. 615, 205 S.E.2d 622 (1974)."

*Morrison v. Sears, Roebuck & Co.*, 319 N.C. 298, 301, 354 S.E.2d 495, 497 (1987) (quoting *Cockerham v. Ward*, 44 N.C. App. 615, 624-25, 262 S.E.2d 651, 658, *disc. rev. denied*, 300 N.C. 195, 269 S.E.2d 622 (1980)). Although both N.C.G.S. § 25-2-314(1) and *Morrison* speak in terms of a plaintiff suing a merchant, a plaintiff may also "bring a product liability action directly against the manufacturer of the product involved for breach of implied warranty." N.C.G.S. § 99B-2(b) (2001); *see also Morrison*, 319 N.C. at 303-04, 354 S.E.2d at 499.

In my view, under *existing North Carolina law*, the forecast of expert evidence in this case, taken in the light most favorable to plaintiff, raises a genuine issue of material fact as to whether the batteries were defective at the time of sale and is, therefore, sufficient to withstand defendant's motion for summary judgment. N.C.G.S. § 1A-1, Rule 56 (2001). The evidence does not, however, compel such a finding; and the credibility of the evidence is for the jury. *See Rose v. Epley Motor Sales*, 288 N.C. 53, 61, 215 S.E.2d 573, 578 (1975).