Premier, Inc. v. Peterson, 2012 NCBC 59.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| COUNTY OF MECKLENBURG | 11 CVS 1054 |

PREMIER, INC.,

                   Plaintiff,

v.

DAN PETERSON; OPTUM COMPUTING
SOLUTIONS, INC.; HITSCHLER-CERA,
LLC; DONALD BAUMAN; MICHAEL
HELD; THE HELD FAMILY LIMITED
PARTNERSHIP; ROBERT WAGNER;
ALEK BEYNENSON; I-GRANT
INVESTMENTS, LLC; JAMES MUNTER;
GAIL SHENK; STEVEN E. DAVIS;
CHARLES W. LEONARD, III and JOHN
DOES 1-10,

                   Defendants.

**ORDER AND OPINION**

*Moore & Van Allen by J. Mark Wilson for Plaintiff Premier, Inc.*

*K&L Gates, LLP by Kiran H. Mehta and Nexsen Pruet, PLLC by Christopher C. Lam for Defendants Dan Peterson, Optum Computing Solutions, Inc., Hitschler-Cera, LLC, Donald Bauman, Michael Held, The Held Family Limited Partnership, Robert Wagner, Alek Beynenson, I-Grant Investments, LLC, James Munter, Gail Shenk, Steven E. Davis, Charles W. Leonard, III and John Does 1-10*

Murphy, Judge.

{1}    **THIS MATTER** is before the Court upon Plaintiff Premier, Inc.'s ("Plaintiff") Motion for Judgment on the Pleadings with respect to Defendants' counterclaims pursuant to Rule 12(c), or Summary Judgment on all claims and counterclaims pursuant to Rule 56 of the North Carolina Rules of Civil Procedure ("Plaintiff's Motion I") and Motion for Protective Order ("Plaintiff's Motion II"); and Defendants Dan Peterson, Optum Computing Solutions, Inc., Hitschler-Cera, LLC, Donald Bauman, Michael Held, The Held Family Limited Partnership, Robert Wagner, Alek Beynenson, I-Grant Investments, LLC, James Munter, Gail Shenk,

Steven E. Davis, Charles W. Leonard, III and John Does 1-10's (collectively "Defendants") Motion for Protective Order ("Defendants' Motion").

{2}     After considering the motions, briefs, affidavits, and arguments and contentions of the parties at the December 14, 2011, hearing, the Court **GRANTS** Plaintiff's Motion I. Plaintiff's Motion II and Defendants' Motion are, therefore, rendered moot.

I.

PROCEDURAL HISTORY

{3}     On January 19, 2011, Plaintiff filed its Complaint seeking a declaratory judgment as to the parties' contractual obligations under a Stock Purchase Agreement dated September 29, 2006.

{4}     Plaintiff also sought designation to the North Carolina Business Court on January 19, 2011. The case was subsequently designated a mandatory complex business case and assigned to this Court.

{5}     On April 27, 2011, Defendants filed an Answer that included counterclaims for Breach of Contract, Recovery of Audit Expenses, and Attorney Fees based upon the parties' Stock Purchase Agreement.

{6}     On August 29, 2011, Plaintiff filed its Motion for Judgment on the Pleadings with respect to Defendants' counterclaims pursuant to Rule 12(c), or Summary Judgment on all claims and counterclaims pursuant to Rule 56 of the North Carolina Rules of Civil Procedure.

{7}     On October 3, 2011, Plaintiff and Defendants filed cross motions for the entry of a protective order.

{8}     The parties briefed their respective legal positions on the Motion for Judgment on the Pleadings and for Summary Judgment, and attached additional materials to be considered on the Motion for Summary Judgment. The Court conducted a hearing on the parties' motions on December, 14, 2011.

## II.

## STATEMENT OF FACTS

{9}   On a motion for summary judgment under Rule 56 of the North Carolina Rules of Civil Procedure, the Court does not make findings of fact.  Therefore, the Court recites only those material facts that the Court concludes are not disputed, and which support the legal conclusions with regard to summary judgment.  *See Hyde Ins. Agency v. Dixie Leasing*, 26 N.C. App. 138, 142, 215 S.E.2d 162 (1975).[1]

{10}   On September 29, 2006, Plaintiff, a Delaware corporation, entered into a Stock Purchase Agreement (the "Agreement") with Optum Computing Solutions, Inc., Hitschler-Cera, LLC, Donald Bauman, Michael Held, Held Family Limited Partnership, Robert Wagner, Alek Beynenson, I-Grant Investments, LLC, James Munter, Gail Shenk, and Steven Davis (collectively "Defendant Sellers"), whereby Plaintiff acquired Defendant Sellers' stock in Cereplex, Inc. ("Cereplex").  (Compl. ¶ 16.)  The Agreement designated North Carolina law to govern the contract and established Defendant Dan Peterson ("Peterson") as Defendant Sellers' Representative.  (Ans. Ex. A §§ 8(g), 8(o).)

{11}   Cereplex is a company that develops and offers Web-based surveillance and analytic services to various healthcare providers through its products, Setnet, PharmWatch, and now, SafetySurveillor.  (Counterclaims ¶¶ 21–22.)  "Setnet provided alerts, reports, and other surveillance functions to help . . . detect, respond to, and prevent [healthcare-associated infections].  PharmWatch provided alerts and reports to assist antimicrobial management teams in reducing unnecessary antibiotic use and optimizing therapy. . . ."  (Counterclaims ¶ 22.)  As the successor product of both Setnet and PharmWatch, SafetySurveillor now performs the same functions as its predecessors under the umbrella of one product.  (Counterclaims ¶ 35.)

{12}   In exchange for Defendant Sellers' stock in Cereplex, Plaintiff was obligated to pay a "Yearly Earnout" to them every five years on the anniversary of

---

[1] Plaintiff's moved the Court for either a judgment on the pleadings or summary judgment. However, for reasons discussed further below, the Court will treat Plaintiff's Motion I as a motion for summary judgment.  *See supra* Section III.A.1.

the acquisition date.  (Compl. ¶ 16; Ans. Ex. A § 2(b)(iii).)  Under the Agreement, the "Yearly Earnout" entitled Defendant Sellers to receive an amount equal to "$12,500 for each Hospital Site where a Product Implementation occurs during the applicable 12-month period . . . ."  (Ans. Ex. A § 2(b)(iii).)

{13}   The Agreement defines "Product Implementation" as follows:

> [A] Hospital Site that has (A) subscribed to or licensed the Company's Setnet or PharmWatch product (or any derivative thereof, successor product, or new product that substantially replaces the functionality of either product), whether such product is provided, sold or licensed (for a charge or at no charge, or provided on a stand-alone basis or bundled with other products and/or services) to the applicable Hospital Site by Company (or its successor in interest), any affiliate of the Company or any reseller authorized by the Company, and (B) completed any applicable implementation, configuration and testing of the product so that the product is ready for production use by the Hospital Site.

(Ans. Ex. A § 2(b)(iii).)

{14}   Defendant Peterson argues that the parties negotiated the above language to allow for a broader definition of Product Implementation, and agreed that it would encompass instances where the product is merely provided to the Hospital Site.  (Peterson Aff. ¶ 16.)

{15}   To determine the Yearly Earnout, Section 6(e) of the Agreement authorizes Defendant Sellers to conduct an audit of Premier's records each year.  (Ans. Ex. A § 6(e).)  The Agreement obligates Premier to provide the relevant records, and Defendant Sellers to bear the costs and expenses.  (Ans. Ex. A § 6(e).)  As Representative for Defendant Sellers, Peterson performed the audit in 2010 pursuant to principles agreed upon with Premier in June 2010.  (Peterson Aff. ¶¶ 24–25.)

{16}   For the audit, Peterson relied on single-event alerts fired by SafetySurveillor to identify Product Implementation at various sites.  (Peterson Aff. ¶ 26.)  "[E]ach alert relates to an individual patient and is specific to the Hospital Site at which the patient was seen . . . ."  (Peterson Aff. ¶ 26.)

{17}   This auditing revealed over 1000 facilities that fired alerts using the SafetySurveillor product.  (Counterclaims ¶ 48, Ex. B.)  Of those facilities,

Defendants claim that Premier only recognized 263 Hospital Sites as having implemented SafetySurveillor such that Premier would owe Defendant Sellers payments under the Earnout provision. (Counterclaims ¶ 52.)

{18} Section 6(e) of the Agreement also provides that, if the audit showed that Premier underpaid Defendant Sellers by more than 5%, then Premier "shall be responsible for any out-of-pocket and reasonable costs and expenses [Defendants] incur in conducting the applicable Audit and the next subsequent Audit conducted . . . ." (Ans. Ex. A § 6(e).) The Agreement further provided for the recovery of attorneys' fees and costs to the prevailing party in any litigation involving or arising out of the Agreement. (Ans. Ex. A § 8(k).)

{19} When it became clear that the parties could not agree on what was owed under the Yearly Earnout provisions of the Agreement, Plaintiff filed this action for a Declaratory Judgment as to the parties' obligations under the Agreement, and for attorneys' fees pursuant to Section 8(k) of the Agreement. (*See* Compl.) In response, Defendants asserted its counterclaims for breach of contract based on the alleged underreporting; for recovery of audit expenses pursuant to Section 6(e) of the Agreement; and for attorneys' fees. (*See* Counterclaims.)

III.

LEGAL ANALYSIS

A.

PLAINTIFF'S MOTION I

1.

STANDARD OF REVIEW

{20} Plaintiff requests relief under either Rule 12(c) for judgment on the pleadings or Rule 56 for summary judgment. As a threshold matter, the Court must determine which standard will govern the disposition of its ruling.

{21} On motion for judgment on the pleadings, the court may only consider the pleadings and any attachments thereto, which become a part of the pleadings. *Minor v. Minor*, 70 N.C. App. 76, 78, 318 S.E.2d 865, 867 (1984). No evidence is

taken, and the court should disregard any factual representations in the briefs of the parties or any other materials presented to the court. *Id.*

{22} "If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 . . . ." N.C. R. Civ. P. 12(c). Generally, when the trial court converts a motion for judgment on the pleadings to a motion for summary judgment, all parties must be given reasonable opportunity to present all material pertinent to summary judgment. *Id.*

{23} In this case, both parties received notice and the opportunity to respond to the summary judgment motion. Indeed, both sides fully briefed the summary judgment motion and presented evidence outside the pleadings to support their respective positions, including responses to interrogatories and affidavits. (*See* Pl's Br. Supp. Mot. J. Pleadings or Summ. J. Ex. 1–3; Defs.' Br. Opp. Mot. J. Pleadings or Summ. J. Appendix.) In their brief opposing Plaintiff's Motion I, Defendants not only presented for the Court's consideration additional matters outside the pleadings, but also argued for summary judgment in their favor. (Defs.' Br. Opp. Mot. J. Pleadings or Summ. J. 3, 9, 13–22.) Because both parties had a reasonable opportunity to present materials pertinent to a motion under Rule 56, and did in fact do so, the Court will consider the proffered matters outside the pleadings and treat Plaintiff's Motion I as a motion for summary judgment pursuant to Rule 56.

{24} Under Rule 56, the Court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." N.C. R. Civ. P. 56(c). "When appropriate, summary judgment may be rendered against the party moving for such judgment." *Coulter v. Newton*, 100 N.C. App. 523, 525, 397 S.E.2d 244, 246 (1990). However, summary judgment should only be granted where questions of law, not fact, remain. *See Robertson v. Hartman*, 90 N.C. App. 250, 252, 368 S.E.2d 199, 200 (1988).

{25}   The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact, which may be met by showing that the opposing party cannot prove an essential element of its claim. *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681, 565 S.E.2d 140, 146 (2002).  If the moving party meets this initial burden, the opposing party must then present specific facts establishing the presence of a genuine factual dispute for trial.  *Lowe v. Bradford*, 305 N.C. 366, 369–70, 289 S.E.2d 363, 366 (1982).

{26}   In ruling on a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party.  *See Wilmington Star-News v. New Hanover Regional Medical Ctr.*, 125 N.C. App. 174, 178, 480 S.E.2d 53, 55 (1997) (citation omitted).

2.

DEFENDANTS' COUNTERCLAIMS

a.

BREACH OF CONTRACT

{27}   To prevail on a breach of contract claim, a party must prove "(1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000) (citation omitted).  Here, the parties do not dispute the existence of a valid contract, as memorialized in the Agreement. (Ans. Ex. A.)  However, the dispute centers on whether Plaintiff breached the terms of the contract by underreporting the number of Hospital Sites with Product Implementation, thus, denying Defendants the total Yearly Earnout due to them under the Agreement.  Specifically, the parties disagree on the proper interpretation of the term "Product Implementation," which would determine how much money Plaintiff owed Defendants.  Accordingly, the Court must first interpret the meaning of the term "Product Implementation" under the Agreement to guide the breach analysis.

i.

### WHAT IS THE MEANING OF "PRODUCT IMPLEMENTATION"?

{28}   "When the language of a contract is clear and unambiguous, construction of the contract is matter for the court." *Self-Help Ventures Fund v. Custom Finish, LLC*, 199 N.C. App. 743, 747, 682 S.E.2d 746, 749 (2009), *appeal dismissed*, 363 N.C. 856, 694 S.E.2d 392 (2010) (quoting *Hagler v. Hagler*, 319 N.C. 287, 294, 354 S.E.2d 228, 234 (1987)).

{29}   To construe the contract, courts look to the four corners of the entire agreement to determine the intent of the parties at the moment of its execution. *Lane v. Scarborough*, 284 N.C. 407, 409–10, 200 S.E.2d 622, 624 (1973); *see also Walton v. City of Raleigh*, 342 N.C. 879, 881, 467 S.E.2d 410, 411 (1996). Ordinarily, "the intention of the parties is a question of law. The court determines the effect of their agreement by declaring its legal meaning." *Lane*, 284 N.C. at 410, 200 S.E.2d at 624. In doing so, "[t]he various terms of the contract are to be harmoniously construed, and if possible, every word and every provision is to be given effect." *Woods v. Nationwide Mut. Ins. Co.*, 295 N.C. 500, 506, 246 S.E.2d 773, 777 (1978).

{30}   "[I]f the meaning of [a contract] is clear and only one reasonable interpretation exists, the courts must enforce the contract as written; they may not, under the guise of construing an ambiguous term, rewrite the contract or impose liabilities on the parties not bargained for and found therein." *Id.*; *see also Crider v. Jones Island Club, Inc.*, 147 N.C. App. 262, 266–67, 554 S.E.2d 863, 866–67 (2001) ("An ambiguity exists in a contract if the language of a contract is fairly and reasonably susceptible to either of the constructions asserted by the parties."). Therefore, parol evidence revealing prior or contemporaneous agreements not reflected in the written terms may not be introduced to contradict or add terms to a clear and unambiguous contract. *See Thompson v. First Citizens Bank & Trust Co.*, 151 N.C. App. 704, 709, 567 S.E.2d 184, 188 (2002).

{31}   Here, the parties offer competing interpretations of the term "Product Implementation" under the Agreement. The Agreement specifically defines the

term "Product Implementation." (Ans. Ex. A § 2(b)(iii).) Because the goal of construing a contract is to arrive at the intent of the parties when the contract was executed, where a contact defines a term, "that definition is to be used." *Woods*, 295 N.C. at 505–06, 246 S.E.2d at 777.

{32} The Agreement requires two elements to co-exist before a finding that "Product Implementation" has occurred at a Hospital Site, triggering Plaintiff's obligation to pay Defendants an additional Earnout Amount. First, the Hospital Site must have

> subscribed to or licensed the Company's Setnet or PharmWatch product (or any derivative thereof, successor product, or new product that substantially replaces the functionality of either product), whether such product is provided, sold or licensed (for a charge or at no charge, or provided on a stand-alone basis or bundled with other products and/or services) to the applicable Hospital Site by [Plaintiff] (or its successor in interest), any affiliate of [Plaintiff] or any reseller authorized by [Plaintiff].

(Ans. Ex. A § 2(b)(iii).) Second, the Hospital Site must have "completed any applicable implementation, configuration and testing of the product so that the product is ready for production use by the Hospital Site." (Ans. Ex. A § 2(b)(iii).) The interpretation of the second requirement is not at issue in this dispute. (Defs.' Br. Opp. Mot. J. Pleadings or Summ. J. 13.)

{33} Under the first requirement, Defendants' argue that the clause "whether such product is provided, sold or licensed . . ." modifies the initial language requiring a subscription or license. (Counterclaims ¶ 36.) Relying on this interpretation, Defendants assert that the first requirement would be met whenever a Hospital Site is merely provided with the product, rather than when the Hospital licenses or subscribes to the product. However, this interpretation would effectively make the initial language requiring a license or subscription superfluous since the requirement would be met by simply providing the product to the Hospital Site. In addition, Defendants ignore the remaining language in the provision.

{34} When read in its entirety, "Product Implementation" occurs when the Hospital Site subscribes to or licenses the product, "whether such product is

provided, sold or licensed (for a charge or at no charge, or provided on a stand-alone basis or bundled with other products and/or services) *to the applicable Hospital Site by [Plaintiff] (or its successor in interest), any affiliate of [Plaintiff] or any reseller authorized by [Plaintiff]*." (Ans. Ex. A § 2(b)(iii)) (emphasis added). The language clearly indicates that, while it does not matter who provides the product to the Hospital Site or whether the Hospital Site is charged, the Hospital Site still must subscribe to or license the product in order for "Product Implementation" to occur. Plaintiff, in fact, argues for this precise interpretation. (Pl.'s Br. Supp. Mot. J. Pleadings or Summ. J. 12–13.)

{35}   Although Peterson, as Defendants' Representative, argues that the parties agreed during negotiations that the definition would encompass instances where the product is merely provided to the Hospital Site (Peterson Aff. ¶ 16), this agreement, at best, adds to the unambiguous terms of the contract requiring a subscription or license. As such, the parol evidence rule bars consideration of this proffered agreement, and the Court must enforce the language as written. In doing so, the Court concludes that Plaintiff's interpretation construes all the terms harmoniously, giving effect to the entire provision. Therefore, the Court concludes that the language is unambiguous, and that Plaintiff has presented a reasonable interpretation of "Product Implementation."

ii.

HAS A BREACH OCCURRED?

{36}   Based on the above, to prove breach under Section 2(b)(iii) of the Agreement, Defendants must allege and prove facts that show Plaintiff failed to compensate them for Hospital Sites that licensed or subscribed the product and completed product implementation, configuration, and testing. However, Defendants' sole claim for breach rests on the alleged miscalculation of the Yearly Earnout applying Defendants' characterization of "Product Implementation." Specifically, Defendants assert that the firing of alerts, used as the basis for the audit, proves that Hospital Sites were provided with the product. Accordingly, Defendants argue, "Product Implementation" occurred and Plaintiff owes

Defendants additional Earnout Amounts. (Peterson Aff. ¶¶ 24–26; Counterclaims ¶¶ 44, 49.) However, as discussed above, this interpretation unreasonably construes the otherwise unambiguous language of the contract that requires a license or subscription, not merely providing the Hospital Site with the product, before "Product Implementation" occurs. Here, all of Defendants' factual allegations support their premise that providing the product equates to "Product Implementation," which the court finds inapt.

{37} Even viewing all the evidence in Defendants' favor, the Court cannot find support for Defendants' breach of contract claim under the interpretation of "Product Implementation" as determined by the Court herein. Nowhere in their Counterclaim do Defendants allege that any of the identified locations for which they had not received payment had subscribed to or licensed the product in question, or that Plaintiff did not pay them for Hospital Sites that had subscribed to or licensed the product. In addition, none of the evidence produced by either party refutes the fact that Plaintiff paid Defendant for each Hospital Site that subscribed to or licensed the product.

{38} In light of the Court's interpretation of "Product Implementation," no disputed facts remain for the Court to resolve regarding breach. Furthermore, Defendants' bare legal conclusion that Plaintiff breached the Agreement will not suffice to support their claim.

{39} Plaintiff has met its burden of showing the absence of a genuine issue of material fact on an essential element of Defendants' counterclaim. In response, Defendants failed to allege or produce specific facts establishing an issue for trial, which they must to do to withstand Plaintiff's Motion for Summary Judgment. Therefore, the Court concludes that Defendants have failed to adequately plead a claim for breach of contract and no genuine issue of material fact remains as to the essential element of breach. Thus, Plaintiff is entitled to judgment as a matter of law.

{40}   Accordingly, the Court hereby **GRANTS** Plaintiff's Motion I for Summary Judgment on Defendants' counterclaim for breach of contract.  The Court, therefore, **DISMISSES** Defendants' counterclaim for breach of contract, with prejudice.

b.

AUDIT EXPENSES AND ATTORNEYS' FEES

{41}   The Agreement only grants recovery of audit expenses to Defendants if they can show they were underpaid, and it only provides attorneys' fees to the prevailing party in a lawsuit.  (*See* Ans. Ex. A §§ 6(e), 8(k).)  Therefore, both counterclaims depend upon Defendants' success on the underlying claim for breach.  Having dismissed Defendants' claim for breach of contract, the Court similarly concludes that Plaintiff is entitled to summary judgment on these remaining counterclaims.

{42}   Accordingly, the Court hereby **GRANTS** Plaintiff's Motion I for Summary Judgment on Defendants' two remaining counterclaims.  The Court, therefore, **DISMISSES** Defendants' counterclaims for the recovery of audit expenses and attorneys' fees, with prejudice.

3.

PLAINTIFF'S CLAIMS

a.

DECLARATORY JUDGMENT

{43}   In its Complaint, Plaintiff seeks a declaratory judgment affirming that Plaintiff has not breached the provisions of the Agreement as alleged by Defendants.  The Court notes that the allegations in the Complaint forming the basis of the Plaintiff's claim for declaratory judgment also form the basis for Defendant's counterclaim for breach of contract discussed above.  Having granted summary judgment in Plaintiff's favor on the breach of contract claim above, the Court concludes that Plaintiff is also entitled to summary judgment on its declaratory judgment claim.

{44}   The Court, therefore, concludes that Plaintiff has not breached the provisions of the Agreement as alleged by Defendants in their counterclaims.

Accordingly, the Court **GRANTS** Plaintiff's Motion I for Summary Judgment on its request for declaratory relief.

b.

ATTORNEYS' FEES

{45}  In North Carolina, a party may not recover attorneys' fees in the absence of express statutory authority. *Stillwell Enter. v. Interstate Equip. Co.*, 300 N.C. 286, 289, 266 S.E.2d 812, 815 (1980).  "Even in the face of a carefully drafted contractual provision indemnifying a party for such attorneys' fees as may be necessitated by a successful action on the contract itself, our courts have consistently refused to sustain such an award absent statutory authority therefor." *Id.* at 289, 266 S.E.2d 815–16 (citations omitted).

{46}  Here, even though the Agreement allows for attorneys' fees, the Court cannot discern, and Plaintiff does not assert, any statutory basis for an award of attorneys' fees in Plaintiff's favor.  Therefore, Plaintiff's claim for attorneys' fees fails as a matter of law.[2]

{47}  Accordingly, the Court **GRANTS** summary judgment in favor of Defendants on Plaintiff's claim for attorneys' fees.  The Court, therefore, **DISMISSES** Plaintiff's claim for attorneys' fees, with prejudice.

B.

PLAINTIFF'S MOTION II AND DEFENDANTS' MOTION

{48}  Because the Court's ruling above resolves all pending claims in this action, Plaintiff's Motion II and Defendants' Motion seeking the entry of a protective order to guide discovery are rendered **MOOT**.

---

[2] The Court notes that North Carolina now validates reciprocal attorneys' fees provisions in business contracts by statute.  N.C. GEN. STAT. § 6-21.6 (2012).  However, Section 6-21.6 only applies to business contracts entered into on or after the statute's effective date of October 1, 2011.  Therefore, the statute does not apply to the Agreement in this case, which was entered into in 2006.

IV.

CONCLUSION

{49}   The Court **GRANTS** Plaintiff's Motion for Summary Judgment pursuant to Rule 56 thereby rendering Plaintiff and Defendants' Motions for Protective Order moot.

{50}   **WHEREFORE**, the Court hereby **DISMISSES**, with prejudice, Defendants' counterclaims for breach of contract, recovery of audit expenses, and attorneys' fees; and Plaintiff's claim for attorneys' fees.

**SO ORDERED**, this the 7th day of December, 2012.